UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

AUG 8 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

---

YOUTH 71FIVE MINISTRIES,

      Plaintiff - Appellant,

  v.

CHARLENE WILLIAMS, Director of the
Oregon Department of Education, in her
individual and official capacities; et al.,

      Defendants - Appellees.

No. 24-4101

D.C. No.
1:24-cv-00399-CL
District of Oregon,
Medford

ORDER

---

Before: BADE, LEE, and FORREST, Circuit Judges.

LEE, Circuit Judge:

Youth 71Five Ministries (71Five) is a Christian organization that serves and mentors at-risk youths of all backgrounds, including those who are not Christian. But 71Five hires only those who share its faith and can thus advance the group's mission and message. Once the state of Oregon learned of this hiring practice, it canceled $410,000 in grants to 71Five, asserting that the group violated the state's non-discrimination policy. The district court denied 71Five's motion for a preliminary injunction, and 71Five has now filed an emergency motion seeking an injunction pending appeal of the district court's order.

We grant the injunction and set an expedited briefing schedule for the appeal. We hold that 71Five is likely to succeed on the merits. Under the Free Exercise

Clause of the First Amendment, the government must treat secular and religious groups equally. But Oregon has not applied its non-discrimination policy neutrally, as it continues to fund secular organizations that favor certain groups based on race and gender identification in violation of the same non-discrimination policy that Oregon relied on in denying funding to 71Five. We also find that 71Five will likely suffer irreparable harm, and that the equities and public interest favor an injunction.

## BACKGROUND

71Five is a nonprofit, Christian ministry in Medford, Oregon that provides services and mentoring to at-risk youth. Its name derives from Psalm 71:5, which says, "Lord God, you are my hope. I have trusted you since I was young." 71Five provides youth centers in two southern Oregon counties "where students can have a safe and supportive place to hang out and develop meaningful relationships" and enjoy free meals and team activities. It also sponsors a community-based ministry to "transform the lives of inner-city youth" by having them "know God and . . . serve their communities." In addition, 71Five provides "voluntary Bible studies," "one-to-one visits and mentoring," and "group discussions" for youths in detention centers, group homes, and emergency shelters.

While it serves youths of all backgrounds without regard to religion, 71Five requires that its employees and volunteers "subscribe and adhere without mental reservation" to a statement of Christian faith. As 71Five puts it, it strives to meet

the youth's "physical, mental, emotional and social needs," but its main goal is for the youth to "have an opportunity of having a personal relationship" with Jesus Christ.

To help fund its charitable activities, 71Five has applied for and received grants through Oregon's Youth Community Investment Grant Program (the Program). The Program, which awards grants in two-year cycles, supports youth services by giving money to charities that meet certain requirements. 71Five received one award for the 2017-19 cycle, three awards for 2019-21, and three awards for 2021-23.

In March 2023, Oregon added a new eligibility requirement to the Program, which we will call the "Certification Rule." The Certification Rule requires a grant applicant to certify that it "does not discriminate in its employment practices, vendor selection, subcontracting, or service delivery with regard to race, ethnicity, religion, age, political affiliation, gender, disability, sexual orientation, national origin, or citizenship status." This was the first time that Oregon required such a certification.[1]

---

[1] Oregon argues that the Certification Rule "is consistent with the state's and [Youth Development] Division's commitment to equitable access, equal opportunity, and inclusion." Oregon law generally prohibits "discrimination against any of its inhabitants because of race, color, religion, sex, sexual orientation, gender identity, national origin, marital status, age, disability or familial status." Or. Rev. Stat. § 659A.006(1) (2023). But this same law expressly provides that it is not unlawful "for a bona fide church or other religious institution . . . to prefer an employee, or an applicant for employment" that belongs to the same religious sect

71Five applied for grants in 2023 and was conditionally awarded about $410,000 for the 2023-25 cycle. But after Oregon received an anonymous tip complaining about 71Five's hiring practices, the state rescinded the grants, stating that 71Five violated the Certification Rule by incorrectly certifying that it does not discriminate. As a result of the rescission, 71Five has not been able to, among other things, hire more staff, expand its apprenticeship career exploration program, or repair equipment at its youth centers.

Although Oregon strictly enforced the Certification Rule against 71Five, it has looked the other way with secular groups that also receive state funding. The record indicates that the state continues to fund many groups that discriminate—by providing services to only subsets of the population—in violation of the Certification Rule. For example, a group named Ophelia's Place continues to receive funds even though it provides services only to "girl-identifying youth." And another group called the Black Parent Initiative receives funds, despite only serving African and African American families.

After 71Five lost its funding, it sued the relevant state officials and sought a preliminary injunction to restore its grants for the 2023-25 cycle. The district court

---

as the institution if the institution concludes "the preference will best serve the purposes of the church or institution" and "[t]he employment involved is closely connected with or related to the primary purposes of the church or institution." *Id.* § 659A.006(4).

denied the motion for preliminary injunction, and 71Five now seeks an emergency injunction pending appeal.

## DISCUSSION

To obtain a preliminary injunction, the plaintiff must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Of these factors, likelihood of success on the merits is the "most important" and "is all the more critical when a plaintiff alleges a constitutional violation and injury." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (internal quotation marks and citation omitted).

We review a district court's denial of a preliminary injunction for abuse of discretion. *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (per curiam). A district court abuses its discretion if it bases its decision "on an erroneous legal standard or on clearly erroneous factual findings." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022) (citation omitted). A factual finding is clearly erroneous if it is "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012) (citation omitted).

## 1. 71Five is seeking a prohibitory injunction.

A preliminary injunction is either "prohibitory" or "mandatory." *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.* ("*FCA*"), 82 F.4th 664, 684 (9th Cir. 2023) (en banc). The distinction depends on whether "the party seeking the injunction seeks to alter or maintain the status quo." *Id.* If the preliminary injunction would preserve the status quo before the controversy arose, then it is a prohibitory injunction. *See id.* at 684–85. If the preliminary injunction would alter that status quo, then it is a mandatory injunction. *Id.*

Here, the district court erred in holding that 71Five is seeking a mandatory injunction. 71Five participated in the Program without issue for years. Oregon's adoption and selective enforcement of the Certification Rule "affirmatively changed" the legal relationship between the parties and created the current controversy. *See id.* at 685. Because 71Five's motion for a preliminary injunction seeks to restore the parties' relationship to its status before Oregon took these actions, it is seeking a prohibitory injunction. *See id.* The district court thus erred in applying the heightened standard applicable to mandatory injunctions.

## 2. 71Five is likely to succeed on its Free Exercise claim because Oregon has not neutrally applied the Certification Rule.

The Free Exercise Clause of the First Amendment provides that the government "shall make no law . . . prohibiting the free exercise" of religion. Besides forbidding "outright prohibitions," this clause also proscribes "indirect

coercion or penalties on the free exercise of religion." *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 778 (2022) (citation omitted). "To avoid strict scrutiny, laws that burden religious exercise must be both neutral and generally applicable." *FCA*, 82 F.4th at 685 (citation omitted).

We have distilled three "bedrock requirements of the Free Exercise Clause." *Id.* at 686. First, the government's "purportedly neutral" policy "may not have a mechanism for individualized exemptions." *Id.* (internal quotation marks omitted) (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)). "Second, the government may not treat comparable secular activity more favorably than religious exercise." *Id.* (ellipsis and internal quotation marks omitted) (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam)). And third, the government may not act "hostile to . . . religious beliefs or inconsistent with the Free Exercise Clause's bar on even subtle departures from neutrality." *Id.* (internal quotation marks omitted) (quoting *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018)). If the government transgresses any of these requirements, strict scrutiny applies. *Id.*[2]

---

[2] Oregon's reliance on *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661 (2010), is misplaced. As we explained in *FCA*, "*Martinez* says little about the Free Exercise Clause analysis" and "runs headlong into more recent Supreme Court authority refining what it means to be 'generally applicable.'" *FCA*, 82 F.4th at 685.

Oregon's actions here likely violated the second bedrock principle because the state has treated comparable secular groups more favorably than 71Five. State policies "are not neutral and generally applicable . . . whenever they treat *any* comparable secular activity more favorably than religious exercise." *Id.* at 688 (quoting *Tandon*, 593 U.S. at 62). As evidenced by their websites, many other participants in the Program discriminate in violation of the Certification Rule. Take a few examples: Ophelia's Place and Girls Inc. only serve girls or those identifying as girls, even though the Certification Rule states that a group cannot discriminate based on gender in providing services. The Black Parent Initiative only serves African and African American families, despite the Certification Rule's prohibition on race-based distinctions. And Adelante Mujeres only serves Latina women and families in violation of the Certification Rule's prohibitions on both gender and race-based discrimination. Yet the state continues to fund these groups while it has revoked 71Five's grants.

The Free Exercise Clause bars the government from treating religious groups worse than secular ones—but Oregon has apparently done just that in selectively enforcing its Certification Rule against 71Five. *See id.* at 688–90. This case falls well within the heartland of our en banc decision in *FCA* in which we held that a public school district could not enforce its non-discrimination policy against the Fellowship of Christian Athletes but not against other secular clubs at the school.

*See id.* at 689 ("Simply put, there is no meaningful constitutionally acceptable distinction between the types of [discrimination] at play here.").

The district court erred in holding that Oregon's actions were neutral. First, it incorrectly believed that the secular groups' exclusionary policies did not violate the Certification Rule because these groups were acting "in culturally responsive ways." The district court apparently believed that these secular groups were, at worst, guilty of only benign discrimination. But we rejected that argument in *FCA*: good intentions cannot justify the unequal treatment of religious organizations. *See id.* at 688 (A state's "alleged good intentions do not change the fact that it is treating comparable secular activity more favorably than religious exercise."). Second, the district court also mistakenly found that there was "no evidence" that the secular programs "refused services for discriminator[y] reasons." This finding ignores the programs' own websites that explicitly admit that they discriminate in the provision of their services. The district court's contrary finding is thus "without support in inferences that may be drawn from the facts in the record." *M.R.*, 697 F.3d at 725.

To be sure, these groups' preferences for serving only certain segments of society may "serve important purposes." *FCA*, 82 F.4th at 689. But that is also true of 71Five's hiring practices, which serve its primary purpose of sharing its faith. "Whether they are based on gender, race, or faith, each group's exclusionary"

practices violate the Certification Rule.  *See id.*  But Oregon has chosen to enforce the rule only against 71Five.  Strict scrutiny thus applies.  *See id.* at 689–90.

To survive strict scrutiny, Oregon's "action must advance interests of the highest order and must be narrowly tailored in pursuit of those interests."  *Carson*, 596 U.S. at 780 (internal quotation marks omitted) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)).  Oregon does not contend that its actions survive strict scrutiny.  And in any event, we conclude that the Certification Rule, which reaches even beyond the strictures of Oregon's anti-discrimination policy, likely is not narrowly tailored to serve its asserted interests.  We thus find that 71Five is likely to succeed on the merits.[3]

### 3.  The remaining factors also favor an injunction.

71Five has shown that, absent an injunction, it is likely to suffer irreparable harm.  The Supreme Court has stated that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (citation omitted).  We have similarly held that this factor is "relatively easy to establish in a First Amendment case" because the plaintiff "need only demonstrate

---

[3] 71Five also argues that Oregon violated its constitutional rights by: (1) excluding it from a public benefit solely because of its religious character and exercise, (2) violating the ministerial exception, and (3) violating its right to expressive association.  Because we find that Oregon has likely not enforced the Certification Rule in a neutral manner, we do not reach these other arguments.

the existence of a colorable First Amendment claim." *Cal. Chamber of Com.*, 29 F.4th at 482 (citations omitted).

As explained earlier, 71Five has shown a "colorable" claim that Oregon's enforcement of the Certification Rule violated its Free Exercise rights and will continue to violate its rights absent an injunction. The state argues that 71Five has not shown irreparable harm because it has only suffered mere economic harm that will not endanger its existence. But 71Five has stated that revocation of the grant will hamper its ministry and mission in violation of its First Amendment rights. That is enough to show irreparable harm at this stage. *See id.*

When a government entity is the party opposing injunctive relief, "the third and fourth factors—the balance of equities and the public interest—'merge.'" *FCA*, 82 F.4th at 695 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Because "it is always in the public interest to prevent the violation of a party's constitutional rights," *Am. Bev. Ass'n v. City & County of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc) (citation omitted), these factors also favor an injunction.

## CONCLUSION

"Anti-discrimination laws and policies serve undeniably admirable goals, but when those goals collide with the protections of the Constitution, they must yield— no matter how well-intentioned." *FCA*, 82 F.4th at 695 (citing *303 Creative LLC v. Elenis*, 600 U.S. 570, 591–92 (2023)). We thus grant the motion for injunctive relief,

Dkt. No. 12, and issue an injunction that: (1) allows 71Five to participate in the 2023-25 Program such that it can seek reimbursement for eligible costs and expenses, and (2) prohibits the state from requiring 71Five to abide by the Certification Rule to the extent that it bars 71Five from only hiring people of its own faith.

We also grant the request to expedite this appeal. The opening brief is due August 26, 2024. The answering brief is due September 13, 2024. The optional reply brief is due September 23, 2024. No streamlined extensions of time to file a brief will be approved. *See* 9th Cir. R. 31-2.2(a)(1).

The Clerk will place this case on the calendar for November 2024. *See* 9th Cir. Gen. Ord. 3.3(g).

24-4101