No. 24-4101
_____
_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

_____

YOUTH 71FIVE MINISTRIES,

     Plaintiff-Appellant,

        v.

CHARLENE WILLIAMS, Director of the Oregon Department of Education, in her individual and official capacities; et al.,

     Defendants-Appellees.

_____

APPELLEES' BRIEF
_____

Appeal from the United States District Court
for the District of Oregon
_____

ELLEN F. ROSENBLUM
Attorney General
BENJAMIN GUTMAN
Solicitor General
KIRSTEN M. NAITO
Assistant Attorney General
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4402
kirsten.m.naito@doj.oregon.gov

Attorneys for Appellees

_____
_____

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ....................................................1

ISSUES PRESENTED FOR REVIEW ...............................................1

STATEMENT OF THE CASE ...........................................................2

    A.    Nature of the Case..............................................................2

    B.    Statement of Facts .............................................................2

    C.    Procedural History ............................................................6

    D.    Rulings presented for Review ...........................................8

SUMMARY OF ARGUMENT .........................................................10

STANDARD OF REVIEW ...............................................................13

ARGUMENT .....................................................................................14

    A.    The district court properly denied plaintiff's motion for
        preliminary injunction..................................................15

        1.    The district court correctly determined, based on the
            record before it, that plaintiff is unlikely to succeed on
            the merits...................................................................... 16

            a.    Plaintiff's free-exercise claim is unlikely to
                succeed...................................................................... 16

                i.    The nondiscrimination requirement does
                     not exclude plaintiff based "solely" on
                     religion. ........................................................ 17

                ii.    The nondiscrimination requirement is
                     generally applicable and neutral. .................. 20

                    (A)    The requirement does not allow for
                          exceptions and was not adopted to
                            target religion....................................... 21

                    (B)    The requirement is not applied

i

differently to comparable secular conduct...................................................... 22

(C) This case is distinguishable from *Fellowship of Christian Athletes*. ........ 26

b. Plaintiff's ministerial exception and ecclesiastical abstention claims are unlikely to succeed..................................................... 29

i. The ministerial exception is a defense and not a basis to obtain affirmative relief. ............................................... 30

ii. The doctrine of ecclesiastical abstention is a limitation on a civil court's authority and does not provide an independent basis to assert a claim against the state. ......... 31

c. Plaintiff's expressive association claim is unlikely to succeed. .................................................. 33

2. The district court correctly determined that plaintiff is unlikely to suffer irreparable harm. .................................... 37

a. Plaintiff seeks a mandatory, rather than prohibitory, injunction. ............................................. 37

b. Plaintiff's alleged harms are not irreparable. ........... 39

3. The balance of equities and public interest do not favor an injunction. ............................................................. 42

B. The district court correctly dismissed the claims for damages against defendants in their individual capacities, but defendants agree that the court erred in dismissing the official-capacity claims. .................................................................43

1. Plaintiff's free-exercise claim is not clearly established............................................................................ 44

2. Plaintiff's remaining claims are not clearly established.......................................................................... 46

CONCLUSION ................................................................. 47

SUPPLEMENTAL EXCERPT OF RECORD

# TABLE OF AUTHORITIES

## Cases Cited

*Act Up!/Portland v. Bagley*,
    988 F.2d 868 (9th Cir. 1993) .................................. 14

*Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*,
    570 U.S. 205 (2013) ......................................... 35, 36

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ................................ 15

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
    750 F.2d 1470 (9th Cir. 1985) ................................ 40

*Anderson v. Creighton*,
    483 U.S. 635 (1987) .......................................... 44

*Anderson v. United States*,
    612 F.2d 1112 (9th Cir. 1979) ................................ 37

*Arizona Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (2014) ......................................... 37

*Ashcroft v. Al-Kidd*,
    563 U.S. 731 (2011) ........................................ 43, 46

*Big Country Foods, Inc. v. Bd. of Educ.*,
    868 F.2d 1085 (9th Cir. 1989) ................................ 14

*Bollard v. California Province of the Society of Jesus*,
    196 F.3d 940 (9th Cir. 1999) ................................. 31

*Boy Scouts of America v. Dale*,
    530 U.S. 640 (2000) .......................................... 33

*Bryce v. Episcopal Church in the Diocese*,
    289 F.3d 648 (10th Cir. 2002) ................................ 30

*Camelot Banquet Rooms, Inc., v. United States Small Bus. Admin.*,
    14 F.4th 624 (7th Cir. 2021) ................................. 43

*Carson v. Makin*,
    596 U.S. 767 (2022) ........................................ 18, 44

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*,
  561 U.S. 661 (2010) ............................................................ 34, 35, 36, 46

*Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*,
  473 U.S. 788 (1985) ...................................................................34

*Employment Div., Dep't of Human Res. v. Smith*,
  494 U.S. 872 (1990) ...................................................................20

*Espinoza v. Montana Dep't of Revenue*,
  591 U.S. 464 (2020) .................................................... 17, 18, 44

*Fed. Trade Comm'n v. Consumer Def., LLC*,
  926 F.3d 1208 (9th Cir. 2019)....................................................13

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
  82 F.4th 664 (9th Cir. 2023)................... 21, 25, 26, 27, 28, 29, 37, 38, 45

*Flexible Lifeline Sys., Inc., v. Precision Lift, Inc.*,
  654 F.3d 989 (9th Cir. 2011)......................................................13

*Frisby v. Schultz*,
  487 U.S. 474 (1988) ...................................................................33

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021) ............................................................ 21, 22

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015)......................................................41

*Harris v. Bd. of Supervisors, L.A. Cty.*,
  366 F.3d 754 (9th Cir. 2004)......................................................13

*Healy v. James*,
  408 U.S. 169 (1972) ...................................................................46

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022)......................................................40

*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*,
  565 U.S. 171 (2012) ...................................................................31

*Illinois Bible Colleges Assn. v. Anderson*,
  870 F.3d 631 (7th Cir. 2017)......................................................19

*Junior Sports Magazines Inc. v. Bonta*,
  80 F.4th 1109 (9th Cir. 2023)......................................................14

iv

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009)...............................................................42

*Locke v. Davey*,
    540 U.S. 712 (2004) ...........................................................................16

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012)......................................................... 15, 23

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
    634 F.2d 1197 (9th Cir. 1980)...............................................................40

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ...........................................................................35

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
    584 U.S. 617 (2018) ...................................................................... 28, 29

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ...........................................................................34

*Nken v. Holder*,
    556 U.S. 418 (2009) ...........................................................................42

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ...........................................................................41

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
    762 F.2d 1374 (9th Cir. 1985)...............................................................41

*Peel v. Atty. Registration & Disciplinary Comm'n*,
    496 U.S. 91 (1990) .............................................................................14

*Puente Arizona v. Arpaio*,
    821 F.3d 1098 (9th Cir. 2016)...............................................................13

*Puri v. Khalsa*,
    844 F.3d 1152 (9th Cir. 2017)......................................................... 30, 32

*Regan v. Taxation with Representation*,
    461 U.S. 540 (1983) ...........................................................................34

*Rosenberger v. Rector and Visitors of Univ. of Virginia*,
    515 U.S. 819 (1995) ...........................................................................34

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*,
    749 F.2d 124 (2nd Cir. 1984)...............................................................40

*Short v. Brown*,
    893 F.3d 671 (9th Cir. 2018)................................................................42

*Southwest Voter Registration Educ. Pro. v. Shelley*,
    344 F.3d 914 (9th Cir. 2003) ....................................................................13

*Tingley v. Ferguson*,
    47 F.3d 1055 (9th Cir. 2022) ...................................................................21

*Tovar v. United States Postal Service*,
    3 F.3d 1271 (9th Cir. 1993) .....................................................................23

*Trinity Lutheran Church v. Comer*,
    582 U.S. 449 (2017) ........................................................... 17, 18, 20, 44

*United States v. Bohn*,
    956 F.2d 208 (9th Cir. 1992) ...................................................................23

*United States v. Sherwin*,
    539 F.2d 1 (9th Cir. 1976) .......................................................................26

*Watson v. Jones*,
    80 U.S. 679 (1871) ..................................................................................32

*White v. Pauly*,
    580 U.S. 73 (2017) ..................................................................................44

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ................................................................. 8, 15, 23, 41

*Wreal, LLC v. Amazon.com, Inc.*,
    840 F.3d 1244 (11th Cir. 2016) ...............................................................42

*Zamani v. Carnes*,
    491 F.3d 990 (9th Cir. 2007) ...................................................................23

## Constitutional and Statutory Provisions

42 U.S.C. § 1983 ............................................................................................2, 6

Or. Rev. Stat. § 417.847(2) ................................................................................2

Or. Rev. Stat. § 417.852 ..................................................................................36

U.S. Const., Amend. I ............. 1, 2, 6, 7, 8, 12, 13, 14, 16, 29, 32, 33, 34, 42, 43,
    44, 45, 46

U.S. Const., Amend. XIV ................................................................................16

**Administrative Rules**

Or. Admin. R. 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....................................................................37


**Other Authorities**

Fed. R. App. P. 10(a) ........................................................................26

## APPELLEES' BRIEF
_____

## STATEMENT OF JURISDICTION

Appellees (defendants) agree with the statement of jurisdiction provided by appellant (plaintiff). (App. Br. 1).

## ISSUES PRESENTED FOR REVIEW

1.  Plaintiff, a religious non-profit, voluntarily applied for grant funding provided by defendants, officials in a state agency. In its application, plaintiff swore that it did not discriminate in its employment practices on the basis of religion. After defendants provisionally awarded grant funding to plaintiff, they received information—and plaintiff later confirmed—that it discriminates on the basis of religion in its hiring practices. Defendants denied plaintiff's grant application. Did the district court abuse its discretion in denying plaintiff's motion for a preliminary injunction, based on its conclusion that plaintiff failed to offer sufficient evidence demonstrating that defendants violated its free-exercise—or any other—right protected by the First Amendment, and that plaintiff was unlikely to suffer irreparable injury?

2.  Are the individual defendants entitled to qualified immunity from damages claims on the ground that they did not violate any clearly established First Amendment law in denying plaintiff's grant application?

2

## STATEMENT OF THE CASE

### A.    Nature of the Case

In this action under 42 U.S.C. § 1983, plaintiff seeks declaratory relief, preliminary and permanent injunctive relief, and compensatory damages.  (3-ER-247).  Plaintiff alleges several violations of the First Amendment, arising from the denial of its grant application.

### B.    Statement of Facts[1]

The Youth Development Division (YDD) of the Oregon Department of Education (ODE) is charged with supporting youth success in education, the workforce, and preventing youth involvement in the justice system and reducing high-risk behaviors.[2]  Or. Rev. Stat. § 417.847(2).  Its vision is to ensure that youth in Oregon "have the opportunity to thrive and achieve their full potential."  (2-ER-177).  Pursuant to those mandates and goals, YDD administers the Youth Community Investment Grants, which are distributed to community-based organizations to provide programming for youth who are at risk of disengaging from school or work.  (3-ER-378).

---

[1]    The statement of facts is largely drawn from the district court's findings and from uncontested declarations.

[2]    Defendants are three individually named state officers: (1) defendant Williams is the Director of ODE; (2) defendant Detman is the Director of YDD; and (3) defendant Bueker is the Deputy Director of YDD.  (3-ER-222–23).

3

Grants are awarded through a competitive application process. Organizations must meet certain eligibility requirements, including that its programming serves at-risk youth and that the organization will monitor and track participant information. (2-ER-182–84). Organizations then submit detailed applications explaining the nature of their programs and where the grant funds will be allocated. (3-ER-387–90). Applications are evaluated based on certain criteria, which include how the project will serve youth and interact with the community. (3-ER-393–94). YDD uses a point-scoring system to rank the applications and then award grant funding. (2-ER-177–78; 3-ER-394–95).

Once an applicant is selected, YDD provides written notice of the conditional award of grant funding, "subject to successful negotiation of any negotiable provisions." (3-ER-396). In addition to a negotiation process, applicants must meet additional requirements before funding will be awarded, such as obtaining insurance. (3-ER-397). The grant is not finalized until the applicant enters into a grant agreement with YDD. (2-ER-146, 178). If a grant is conditionally awarded, but is later withdrawn, the grant funds are allocated to the next highest-scoring applicants. (2-ER-178). Once YDD enters into a grant agreement with an organization, that organization will submit reports on grant

4

activities and expenditures, and ODE will issue grant funding to reimburse those expenses.  (2-ER-178).

In 2022, YDD added an eligibility condition requiring grant applicants to certify that they do "not discriminate in [their] employment practices, vendor selection, subcontracting, or service delivery with regard to race, ethnicity, religion, age, political affiliation, gender, disability, sexual orientation, national origin, or citizenship status."  (2-ER-179, 184).  YDD added that requirement to match other state agency grant award eligibility requirements.  (2-ER-179).  Without that certification, applicants would be ineligible to apply for, or be awarded, grant funding.  (2-ER-178).

YDD issued a Request for Grant Applications (RFA) for the 2023-2025 biennium (beginning July 2023) in March 2023.  (3-ER-376–33).  In addition to providing the above-described information about the grant application and process, the RFA notified applicants that an application could be rejected if it failed to "substantially comply with all prescribed RFA procedures and requirements."  (3-ER-387).

Plaintiff, Youth 71Five Ministries, a non-profit religious organization, applied.  (3-ER-195).  Plaintiff's "'primary purpose' is to teach and share about the life of Jesus Christ," and plaintiff offers programs for youth and families that foster "social interaction, vocational training, and meaningful relationships,

all while emphasizing the importance of having a relationship with Jesus Christ." (3-ER-196). Plaintiff requires employees and volunteers to "subscribe and adhere without mental reservation" to a statement of Christian faith and be actively involved in a local church. (1-ER-4; 3-ER-197–98, 227).

In its application, plaintiff sought $220,000 for its at-risk youth centers that provide "mentoring, education support, and recreational activities." (3-ER-203). $80,000 of that amount would allow plaintiff to provide free space to two other non-profit organizations that serve the same population. (3-ER-203). Plaintiff also sought $120,000 to fund a program for youth involved in the juvenile justice system. (3-ER-203). In previous years, plaintiff had been awarded grant funding from YDD. (3-ER-201–02).

Plaintiff knew that the grant application required it to certify that its organization complied with the nondiscrimination policy. (3-ER-204). Despite its religious employment requirements, it certified that it complied with the nondiscrimination policy and was eligible to receive grant funding. (1-ER-4; 3-ER-205).

Based on plaintiff's sworn statement that it was eligible to receive funding, YDD conditionally awarded the grant funding plaintiff applied for, and conditionally awarded plaintiff an additional $70,000 as a subgrantee of another grant application. (3-ER-205). Five other faith-based organizations received

6

funds from YDD; none of those organizations discriminate in their employment and volunteer hiring practices. (3-ER-205–06).

In September 2023, a member of the public reported plaintiff's religious employment requirements to YDD. (2-ER-180). YDD reviewed plaintiff's online employment page and confirmed plaintiff's requirement that employees and volunteers agree to the statement of Christian faith. (2-ER-180). YDD contacted plaintiff by email to confirm whether that information was correct and to notify plaintiff that it appeared to be ineligible to receive grant funding. (3-ER-411–13). Plaintiff responded the next day and confirmed that it discriminated in its employment practices. (3-ER-410). YDD withdrew the conditional award in November 2023. (1-ER-5; 2-ER-147, 180).

## C.    Procedural History

Plaintiff commenced this action four months later in March 2024 by filing a complaint under 42 U.S.C. § 1983. (3-ER-219–48). Plaintiff's complaint alleged four First Amendment claims: (1) that defendants violated its free exercise right by excluding an otherwise eligible religious organization from government funds; (2) that defendants violated the Religion Clauses—the "ministerial exception" and "church autonomy" doctrine—by interfering with plaintiff's employment decisions; (3) that defendants violated plaintiff's free exercise rights by requiring it to give up its religious-employment practices; and

7

(4) that defendants violated plaintiff's expressive-association right to by forcing it to give up its religious-employment practices. (3-ER-241–46). Plaintiff sought declaratory and injunctive relief, compensatory and nominal damages, and attorneys' fees. (3-ER-247). The parties consented to magistrate judge jurisdiction. (3-ER-425–26).

Several weeks after filing its complaint, plaintiff moved for a preliminary injunction "reinstating" the grants, enjoining defendants from requiring plaintiff to abide by the nondiscrimination requirement as a condition to receive the grant funding, and enjoining defendants from refusing future grant funding based on plaintiff's religious-employment practices. (SER-140; 3-ER-426). Plaintiff argued that it was likely to succeed on the merits of its free-exercise claim because the government may not subsidize private secular programs but exclude "otherwise eligible" religious organizations on the basis of religion. (SER-151–54). Plaintiff also argued that the nondiscrimination rule was not neutral or generally applicable, such as to comply with the First Amendment, because defendants retained discretion to negotiate "some provisions" of the grant, and because YDD can dispense with its evaluation process if only one application is submitted. (SER-155).

Defendants responded and plaintiff replied with new arguments and new evidence. (SER-38–66, 93–134; 2-ER-100–44). For the first time, plaintiff

argued that defendants were not applying the rule equally because they had funded other applicants who discriminate on the bases of race, ethnicity, gender, and national origin in providing services. (SER-50–51). In support of that argument, plaintiff offered exhibits of screen shots purportedly depicting other grant recipient's websites. (2-ER-109–44). Those organizations have "missions" to help and "serve" specific populations, such as young women, African, African American, and Latinx communities. (1-ER-8–9).

On the same day that defendants responded to the preliminary injunction motion, they filed a partial motion to dismiss the claims for damages against defendants in their individual capacities pursuant to qualified immunity. (SER-67–92). The parties filed additional briefing addressing that motion. (SER-3–35; 2-ER-81–99).

## D. Rulings presented for Review

The district court held a hearing on both motions (2-ER-27–65), after which it issued an opinion and order denying plaintiff's motion. (1-ER-3–20). Applying the factors from *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), the district court concluded that plaintiff had not established a likelihood of succeeding on the merits on any of its First Amendment claims. (1-ER 5–7). As to the free-exercise claim, the court concluded that the nondiscrimination requirement was neutral and generally applicable, and that

defendants did not deny plaintiff's grant application based on its religious exercise. (1-ER-7).

As to plaintiff's argument that the rule is not generally applicable because YDD approved grant funding for organizations that discriminate in their provision of services, the court ruled that its appearance for the first time in the reply brief was reason alone not to consider it. (1-ER-9). Putting that barrier aside, the court concluded that, "even if [those] facts * * * were properly at issue before the Court," it would reject that argument because there was no evidence "that people who fall outside the target demographics of each organization are refused services for discriminatory reasons." (1-ER-9). The court rejected plaintiff's arguments that it was likely to succeed on any of its other claims and concluded that the nature of plaintiff's requested relief— ordering YDD to fund the grant—was mandatory rather than prohibitory, which placed a higher burden on plaintiff. (1-ER-11–15). As to the other preliminary injunction considerations, the court found that plaintiff had not alleged facts to support irreparable harm because the constitutional violation had occurred more than four months before the complaint was filed and any harm was historical, rather than on-going; and that the balance of equities and the public interest did not weigh in favor of an injunction, due the mandatory nature of the relief requested. (1-ER-17–19).

10

The district court also granted defendants' partial motion to dismiss. Based on its previous conclusion that plaintiff was unlikely to succeed on the merits of its claims, and because "there is no precedent determining that a religious organization's right to use discriminatory employment practices can be the basis for an affirmative claim against a government agency who denies grant funding for that reason," the court concluded that plaintiff's rights were not clearly established. (1-ER-19). Although defendants' motion to dismiss addressed only the damages claim, the court dismissed *all* of plaintiff's claims—including those alleging declaratory and injunctive relief—and issued a final judgment. (1-ER-2). Plaintiff appeals the order denying its motion and that judgment. (3-ER-415–19).[3]

## SUMMARY OF ARGUMENT

1.    The district court properly denied preliminary injunctive relief. Plaintiff is unlikely to prevail on the merits for any of its three claims.

First, plaintiff cannot demonstrate that defendants violated its free-exercise rights. The nondiscrimination requirement does not exclude plaintiff from grant funding "solely" based on religion. Additionally, the

---

[3]    Plaintiff sought an injunction pending appeal (Docket 11), which a motions panel granted, concluding that plaintiff was likely to succeed on the merits of the appeal, had demonstrated irreparable harm, and that the balance of equities and public interest weighed in favor of an injunction. (Docket 18).

11

nondiscrimination requirement is neutral and generally applicable.  The grant

application, evaluation, and negotiation processes do not provide for an

individual exemption to be granted for that requirement.  Nor was the

requirement adopted to target religious beliefs.

The district court properly declined to consider plaintiff's evidence

purporting to demonstrate that defendants had exempted comparable secular

activity from the nondiscrimination requirement, because plaintiff offered that

evidence for the first time in its reply briefing in the district court.  Regardless,

the district court correctly concluded that plaintiff's evidence did not

demonstrate that other, secular grant recipients were discriminating based on

race or other protected classes in violation of the requirement.

Second, plaintiff is unlikely to succeed on its ministerial exception and

ecclesiastical abstention claims.  The ministerial exception is a defense that

exempts religious organizations from most employment discrimination claims.

It does not provide an affirmative right to participate in state-funded programs.

Similarly, the ecclesiastical abstention doctrine is a limitation on civil courts.  It

restricts courts from weighing in on religious law but does not provide an

independent basis for relief.

Third, plaintiff is unlikely to succeed on its expressive-association claim.

The government has wide latitude to provide an express benefit, such as grant

funding, so long as its actions are content and viewpoint neutral, and reasonable. The requirement at issue here is content and viewpoint neutral because it does not seek to regulate the speech of its applicants; rather, it seeks to prevent the funding of organizations that discriminate in their employment practices. And it is reasonable in light of defendants' goals in providing equitable services to high-risk youth.

The other factors also weigh against preliminary injunctive relief. As the district court concluded, plaintiff seeks a mandatory injunction requiring defendants to enter into contracts, monitor, and fund plaintiff's programs. Plaintiff did not allege facts demonstrating irreparable harm and waited for four months to seek an injunction after YDD revoked the conditional approval. The district court correctly found that the burden on defendants to expend public funds weighed heavily against an injunction and did not abuse its discretion in denying preliminary injunctive relief.

2.    The district court correctly dismissed the individual-capacity claims seeking damages against defendants. Qualified immunity protects state officials from such claims unless that official violates a constitutional right that is clearly established. For the same reasons that plaintiff is unlikely to succeed on the merits of its claims, its rights are not clearly established. Although the general principles of First Amendment law are well-established, cases applying

13

those principles turn on highly fact-dependent questions. There are no cases that hold that a state violates the First Amendment when it requires grant applicants to abstain from discriminating on the basis of religion in its employment practices.

But because the district court erred in dismissing plaintiff's claims for declaratory and injunctive relief against defendants in their official capacities, this court should reverse and remand back to the district court for further proceedings on those claims.

## STANDARD OF REVIEW

A district court's decision regarding preliminary injunctive relief is subject to limited review. *See Puente Arizona v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016); *Flexible Lifeline Sys., Inc., v. Precision Lift, Inc.*, 654 F.3d 989, 993–94 (9th Cir. 2011) (per curiam); *Harris v. Bd. of Supervisors, L.A. Cty.*, 366 F.3d 754, 760 (9th Cir. 2004) ("limited and deferential"); *Southwest Voter Registration Educ. Pro. v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (same). The court's decision should be reversed only if it abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *See Fed. Trade Comm'n v. Consumer Def., LLC*, 926 F.3d 1208, 1212 (9th Cir. 2019); *Puente Arizona*, 821 F.3d at 1103; *Harris*, 366 F.3d

14

at 760.[4]  Additionally, this court may affirm on any ground supported by the

record.  *Big Country Foods, Inc. v. Bd. of Educ.*, 868 F.2d 1085, 1088 (9th Cir.

1989) (affirming the denial of a motion for preliminary injunction on a basis not

relied upon by the district court).

"[W]hether the law governing the conduct at issue is clearly

established[,]" such as to preclude qualified immunity, "is a question of law for

the court."  *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).

## ARGUMENT

Plaintiff challenges the district court's denial of its motion for

preliminary injunction and dismissal of its complaint.  (App. Br. 2).  But, for the

reasons explained below, the district court properly denied preliminary-

---

[4]     Relying on *Junior Sports Magazines Inc. v. Bonta*, 80 F.4th 1109 (9th Cir. 2023), plaintiff contends that this court reviews a district court's factual findings *de novo*.  (App Br 18).  In that case, this court cited to *Peel v. Atty. Registration & Disciplinary Comm'n*, 496 U.S. 91, 108 (1990) for the proposition that this court reviews whether factual findings "satisfy a First Amendment legal standard" *de novo*.  But *Peel* stands for the proposition that an appellate court will not defer to a lower court's interpretation of "the inherent character" of an *undisputed* statement, *i.e.*, a legal determination of whether a statement is discriminatory.  *Id*.  There, the Court rejected a lower court's finding that an attorney's letterhead was misleading" and thus not protected by the First Amendment.  *Id*.  The Court did not suggest that an appellate court may review, in the first instance, the character of a *disputed* statement.  Here, the parties dispute whether plaintiff's exhibits demonstrate that certain grant-recipient organizations exclude services on the basis of gender and race.  This court should defer to the district court's finding that they do not.

15

injunctive relief. Although the court erred in dismissing some of plaintiff's claims at the motion-to-dismiss stage, it correctly dismissed the individual-damages claims based on qualified immunity.

## A. The district court properly denied plaintiff's motion for preliminary injunction.

A preliminary injunction is an "extraordinary remedy," appropriate only "upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Such relief is warranted only if (1) plaintiff is "likely to succeed on the merits"; (2) plaintiff is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [plaintiff's] favor"; and (4) "an injunction is in the public interest." *Id.* at 20 (citation omitted); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (preliminary injunctive relief is also appropriate under an alternative "serious questions" test, if there are "serious questions going to the merits," the balance of hardships "tips sharply toward the plaintiff," and the other two elements of the *Winter* test are met). Preliminary injunctive relief is inappropriate unless plaintiff makes a "clear showing" that those elements are satisfied. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

As explained below, plaintiff did not satisfy the elements from the *Winter* test and the district court did not abuse its discretion by denying preliminary injunctive relief.

16

### 1. The district court correctly determined, based on the record before it, that plaintiff is unlikely to succeed on the merits.

The First Amendment, as incorporated by the Fourteenth Amendment, prohibits government actions that promote or "establish[]" religion (the Establishment Clause), and prohibits such actions that burden "the free exercise" of religion (the Free Exercise Clause). U.S. Const. amend. I. The First Amendment also protects "the freedom of speech" (The Free Speech Clause), including for religious organizations. *Id.*

In its complaint, plaintiff alleged that, in revoking its approval for grant funding, defendants violated all of the above rights. (3-ER-241–46). But the district court correctly concluded that plaintiff was unlikely to succeed on its claims.

### a. Plaintiff's free-exercise claim is unlikely to succeed.

As noted above, the First Amendment contains both the Establishment Clause, which *requires* the separation of church and state, and the Free Exercise Clause, which *prohibits* any restraints on the practice of religion. Those clauses "are frequently in tension," but "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." *Locke v. Davey*, 540 U.S. 712, 718 (2004). The action at issue here falls in that latter category. Neither party disputes that YDD is permitted by the Establishment Clause to provide funding to plaintiff; the question on appeal is whether, once

the government has chosen to provide funding to religious organizations, the Free Exercise Clause *requires* YDD to fund religious organizations that discriminate in their employment practices.  It does not.

### i. The nondiscrimination requirement does not exclude plaintiff based "solely" on religion.

The Supreme Court has held that the Free Exercise clause prohibits a government from excluding a religious organization "from a public benefit for which it is otherwise qualified, solely because" of its religious status.  *Trinity Lutheran Church v. Comer*, 582 U.S. 449, 467 (2017).  In *Trinity Lutheran*, the Supreme Court struck down a policy prohibiting grant funding to religiously affiliated applicants.  *Id.*  There, the policy prohibited organizations "owned or controlled by a church, sect, or other religious entity" from applying for a state-funded grant to pay for the pavement of its playground.  *Id.* at 455.  The Court held that the policy violated the Free Exercise Clause by expressly excluding organizations from participating in a government program "solely" because of their religious character.  *Id.* at 463.

Similarly, in *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 487 (2020), the Court held that religious schools could not be expressly excluded from receiving state-funded scholarships provided to all private schools.  The state enacted a scholarship program for children to use to pay tuition at private schools.  *Id.* at 468–69.  At issue was whether a provision in the Montana State

18

Constitution prohibiting the government from providing aid to sectarian schools could be applied to disqualify religious schools from participating in the scholarship program. *Id*. at 474. The Court held that, because the provision specifically excluded religious schools "solely" based on religion, it violated the Free Exercise Clause. *Id*. at 487.

And in *Carson v. Makin*, 596 U.S. 767, 781 (2022), the Court held that a requirement prohibiting state-funded tuition assistance from being used for religious schools violated the Free Exercise Clause. There, the state created a program to pay for a student's tuition at a private school in rural areas without public schools. *Id*. at 773–74. Private schools had to meet certain requirements to be eligible for the program, including that the school be "nonsectarian." *Id*. at 774. The Court held that that express "nonsectarian" requirement—akin to the express exclusion at issue *Espinoza*—disqualified religious schools from receiving funding "solely because they are religious." *Carson*, 596 U.S. at 780.

In contrast to the unconstitutional rules and program requirements at issue in *Trinity Lutheran*, *Espinoza*, and *Carson*, the nondiscrimination requirement here makes no reference to the religious nature of organizations applying for funding. Rather, the requirement mandates that, to receive grant funding, organizations must not engage in discriminatory hiring practices. That requirement explicitly regulates employment practices and does not disqualify

19

organizations "solely" on their religious character. *See Illinois Bible Colleges Assn. v. Anderson*, 870 F.3d 631, 639–40 (7th Cir. 2017) (statutes requiring all colleges—including religious institutions—to comply with state requirements if they offer degrees upon graduation did not violate the Free Exercise Clause).

Moreover, YDD was fully aware of plaintiff's religious status when it initially approved the grant funding, which demonstrates that the religious nature of plaintiff's organization was not the reason that the funding was withdrawn. The RFA specifically provides that "faith-based organization[s]" are eligible for the grant and YDD provided grant funding to other religious organizations, demonstrating that the nondiscrimination requirement does not disqualify religious organizations based "solely" on religion. (3-ER-235–36, 379).

Plaintiff argues that an exclusion based on its employment practices is equivalent to an exclusion based on a religious nature because "its employment practice is essential to [its] mission and message." (App. Br. 27). Relying on cases that evaluated whether religious schools qualified for a statutory religious exemption, plaintiff argues that "hiring coreligionists is a *defining* characteristic of most religious organizations." (App. Br. 28) (emphasis in original). But there is nothing in the record that demonstrates that *all* religious organizations discriminate on the basis of religion in their hiring practices. Indeed, as noted

above, the record reflects—and plaintiff does not dispute—that the other

religious organizations that received grant funding *do not* have discriminatory

hiring practices.  (3-ER-235–36).

### ii. The nondiscrimination requirement is generally applicable and neutral.

A government program or action, such as those described above, that

excludes applicants based solely on religion is subject to strict scrutiny.  *Trinity*,

582 U.S. at 466.  But a neutral and generally applicable law that incidentally

burdens the free exercise of religion is subject to rational basis review.

*Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 878–82 (1990).

That is so because the constitution does not guarantee an unlimited right to

religious practice, and individuals are not excused from complying "with an

otherwise valid law prohibiting conduct that the State is free to regulate."  *Id*. at

879.

Three general principles govern whether a law is generally applicable and

neutral:

> First, a purportedly neutral generally applicable policy may not
> have a mechanism for individualized exemptions.  Second, the
> government may not treat comparable secular activity more
> favorably than religious exercise.  Third, the government may not
> act in a manner hostile to religious beliefs or inconsistent with the
> Free Exercise Clause's bar on even subtle departures from
> neutrality.

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82

F.4th 664, 686 (9th Cir. 2023) (cleaned up) ("*Fellowship*").  *See also Tingley v. Ferguson*, 47 F.3d 1055, 1084–87 (9th Cir. 2022) (in addition to being "neutral on its face," "the real-world operation of a law" must not target religion, the law cannot restrict religious "practices *because of* the religious motivations," and the circumstances of the adoption of law must not demonstrate that it was implemented to target religion); *Fulton v. City of Philadelphia*, 593 U.S. 522, 533–34 (2021) (a law is not generally applicable if it "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions" or when it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way").  As argued below, the nondiscrimination requirement at issue here satisfies those factors.

> **(A)**   **The requirement does not allow for exceptions and was not adopted to target religion.**

The record reflects, and the district court found, that the requirement does not have a mechanism to allow for exceptions.  (1-ER-7–8).  The RFA notified all applicants that if they did not meet that requirement, they would be ineligible to receive grant funding.  (3-ER-387).  The application itself did not allow for applicants to request an exception.  (3-ER-345).  Nor did the evaluation process allow for an exception to that requirement.  The RFA

explained that the evaluation process occurs *after* applications are accepted, *i.e.*, only organizations that were eligible would be evaluated. (3-ER-391). Finally, that requirement is not negotiable after initial approval. (2-ER-146, 178).

Indeed, plaintiff alleged that it misrepresented its hiring practices because "it had no other choice. A failure to [agree to the requirement] would have cause [its] application to be 'considered non-responsive,' meaning it would not be considered further." (3-ER-234–35). Put another way, plaintiff was unable to seek an exception to the requirement because there was no "mechanism to seek an individualized exemption." *Fulton*, 593 U.S. at 533.

Finally, the record does not reflect that YDD adopted the rule to target religion or otherwise demonstrate that YDD had a motive "hostile to" religion in adopting the requirement. Rather, the record demonstrates that the requirement was adopted to prohibit discrimination, promote equity, and bring the grant application in line with other agencies. (2-ER-178–79).

**(B)  The requirement is not applied differently to comparable secular conduct.**

The record does not reflect that the requirement is applied differently to comparable secular conduct, such as to render it not neutral or not generally applicable. The district court rejected plaintiff's arguments and evidence that any of the secular organizations that received grant funding had discriminated in their provision of services. (1-ER-8–10).

23

As an initial matter, in support of its argument that the requirement was not neutral, plaintiff relied on evidence that it improperly offered for the first time in its reply brief. In general, a party may not raise new legal issues for the first time in a reply brief. *See*, *e.g.*, *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("the district court need not consider arguments raised for the first time in a reply brief."); *United States v. Bohn*, 956 F.2d 208, 209 (9th Cir. 1992) (discussing that courts generally decline to consider arguments raised for the first time in a reply brief). That is so because the opposing party is not given the opportunity to respond to those arguments. *See Tovar v. United States Postal Service*, 3 F.3d 1271, 1273 n.3 (9th Cir. 1993) (striking new arguments and evidence offered in a reply brief because the opposing party was deprived of the opportunity to respond).

In the context of a motion for a preliminary injunction, where the party seeking the injunction bears the burden of making a "clear showing" that the *Winter* elements are satisfied, *Lopez*, 680 F.3d at 1072, raising arguments for the first time in a reply brief raises the same concerns.

Here, after agreeing to a briefing schedule and hearing date, plaintiff waited until the reply brief to allege additional facts and offer new evidence. (3-ER-427). Plaintiff had other options after receiving defendants' response, such as delaying the hearing on its motion and seeking permission to amend

that motion, or asking the district court for permission to conduct limited discovery. Because plaintiff chose to move forward with offering that evidence for the first time in its reply, nothing required the district court to consider that evidence.[5]

In any event, the district court did not clearly err in finding that plaintiff's exhibits failed to prove that those organizations discriminate in their provision of services. Those exhibits indicate that, like plaintiff, those organizations have missions directed towards serving certain populations. (2-ER-109–44). But none of those exhibits indicate that those organizations refuse to serve or otherwise exclude persons outside of those populations. Although those organizations focus their efforts on particular populations and may even publicly disavow that they will serve certain groups, they may still provide services to everyone for the particular grant programs at issue here. Those organizations agreed to the nondiscrimination policy in order to receive funding. And, unlike plaintiff, there was no evidence before the district court demonstrating that those organizations were specifically asked whether they

---

[5] The motions panel, which relied on the same evidence, may have overlooked that procedural barrier when it granted relief. But this court should conclude that evidence was not properly before the district court.

discriminate, or evidence of any response.[6]

Nor is service delivery "comparable" to hiring employees and volunteers. *See Fellowship*, 82 F.4th at 686 (describing second consideration as whether the government "treat[s] comparable secular activity more favorably"). Although the certification prohibits discrimination both in service delivery and in hiring, those activities involve different considerations. Service delivery is about who participates in the grant-funded program; hiring is not. Even if the tailoring of services for a target youth demographic could be considered "discrimination," that tailoring is directly related to providing effective services to high-risk youth. In contrast, plaintiff's practice of hiring coreligionists relates to its internal values and policies; it does not make the services more effective. Because none of the comparators that plaintiff relies on purport to discriminate in their hiring practices, they are not comparable for these purposes.

In arguing to the contrary, plaintiff offers evidence that was not in the record before the district court. (*See* App. Br. 22–23 (citing other grant

---

[6]    The motions panel erred in treating those organizations as similarly situated to plaintiff based on the screenshots from their websites. (*See* Docket 18, Order at 8). Plaintiff was disqualified based on a direct question and answer that confirmed that it does not, and would not, abide by the nondiscrimination policy. (3-ER-407–13). The record demonstrated nothing comparable from the other organizations.

26

recipients' websites)).  This court should decline plaintiff's invitation to consider that evidence.  *See* Fed. R. App. P. 10(a) (the record on appeal is limited to "the original papers and exhibits filed in the district court"; the transcripts of the district court proceedings; and the docket entries); *United States v. Sherwin*, 539 F.2d 1, 5 n. 4 (9th Cir. 1976) (refusing to reverse based on evidence that was not in the record).

On the merits, plaintiff states that defendants "violated all three [neutral and generally applicable] requirements," but it appears to dispute only whether the requirement was applied in such a way that it discriminates against religious conduct while allowing comparable secular conduct.  (*See* App. Br. 20 (arguing that defendants "disparaged" and "punished" plaintiff by failing to apply the requirement to all grant recipients), App. Br. 24 (arguing that the "double standard [of allowing secular grantees to discriminate] reveals a mechanism of individualized assessments and reflects its religious hostility")).  But, as argued above, the district correctly ruled that plaintiff's evidence was not properly before it and that, even if it was, it did not demonstrate secular discrimination such as to undermine the purpose of the requirement.

### (C)    This case is distinguishable from *Fellowship of Christian Athletes*.

Finally, contrary to plaintiff's assertion, this case is like *Fellowship*. (App. Br. 23).  There, a school district revoked its recognition of a religious

27

student organization (FCA) that had clubs at several schools in the district after a teacher at one of those schools complained about the organization's requirement that its leaders agree to a statement of faith. *Fellowship*, 82 F.4th at 673–74. An official school committee concluded that the statement of faith was discriminatory and, based on that conclusion, the district revoked the FCA's official status. *Id*. at 675. FCA later filed suit against the district. *Id*. at 677–78.

As a result of the litigation, the district adopted a new non-discrimination policy requiring all officially recognized clubs to agree to allow all students to participate, "regardless of his or her status or beliefs." *Id*. at 678. Despite that policy, the district allowed secular clubs to limit membership based on gender, race, and, among other attributes, "good moral character." *Id*. FCA did not apply for recognition under the new policy, but the principal confirmed that it would not have succeeded. *Id*.

This court held that the policy violated the Free Exercise Clause in three ways. First, the court concluded that the policy was not "generally applicable." The court noted that the district had a mechanism to disregard the policy "on an ad hoc basis." *Id*. at 687. Although the district claimed it had not used that mechanism, the record demonstrated that the district had approved clubs that "facially discriminate on the basis of sex and ethnicity." *Id*. In addition, by

28

allowing clubs to further discriminate on non-discriminatory bases, such as a person's moral character, the district's policy was not "generally applicable."

Second, the court concluded that the policy violated the Free Exercise Clause because it was not neutral, *i.e.*, the record demonstrated that the district was treating secular activity more favorably than religious activity. The court relied on evidence that the district had recognized a club with an "express membership requirement" based on gender, a status purportedly protected by the policy. *Id.* at 689.

Finally, this court concluded that the district had violated the Free Exercise Clause by demonstrating overt and obvious "hostility" toward FCA. *Id.* at 690. Comparing this case to *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617 (2018), in which the Supreme Court held that a commission violated the Free Exercise Clause by applying a law in a manner "hostile" to religion, this court concluded that the committee that found that FCA's requirements were discriminatory had acted in the same manner. It relied on extensive evidence in the record that school officials had acted with hostility towards FCA: teachers on the committee tried to ban FCA from the campus, shamed and intimidated students who participated in FCA, described FCA's religious beliefs as "bullshit," and made other negative and derogatory statements about FCA. *Fellowship*, 82 F.4th at 675–77, 692.

Here, as argued above, there is no mechanism for defendants to grant exceptions. Additionally, there is no direct evidence that other grant recipients in fact discriminate. Evidence that some organizations "tailor" their programming or have a mission to "serve" a certain population is not the kind of express evidence of discrimination that was present in *Fellowship*. Nor is there evidence of the kind of "hostility" that was at issue in *Fellowship* and plaintiff did not allege in its complaint that defendants had violated the First Amendment by demonstrating the kind of hostility at issue *Fellowship* or *Masterpiece Cakeshop*.[7]

In sum, because the nondiscrimination requirement does not allow for individualized exceptions, applies to all grant recipients, and was not adopted to target religion, plaintiff is unlikely to succeed on the merits of its claim.

>    **b.**     **Plaintiff's ministerial exception and ecclesiastical abstention claims are unlikely to succeed.**

In its complaint and preliminary-injunction motion, plaintiff alleged and argued that defendants had violated its First Amendment rights by violating its rights under the "Church Autonomy[8] and the Ministerial Exception." (3-ER-

---

[7]     For the same reasons, the motions panel also erred in concluding that this case was like *Fellowship*.

[8]     Plaintiff referred to the "Church Autonomy doctrine" in the district court, consistent with the 10th Circuit's terminology in *Bryce v. Episcopal*

*Footnote continued...*

242; SER 157–60). Plaintiff asserted that the ministerial exception, which excludes churches from certain types of employment discrimination actions when it selects and removes its religious leaders, creates a right that defendants violated. (SER-158–59). Alternatively, plaintiff argued that defendants violated its broader "church autonomy" by conditioning the grant on its employment discrimination. (SER-159–60).

The district court rejected those arguments and concluded that those claims "fail[ed] to state a cognizable claim for relief." (1-ER-11). On appeal, plaintiff combines its arguments and asserts that defendants "violate[d] [its] religious autonomy." (App. Br. 30–33). But the district court correctly concluded that plaintiff was unlikely to succeed on claims based on the ministerial exception and the ecclesiastical abstention doctrine.

### i. The ministerial exception is a defense and not a basis to obtain affirmative relief.

"The ministerial exception is an affirmative defense[] * * * that applies to claims that impinge on a protected employment decision regarding a religious organization and its ministers." *Puri v. Khalsa*, 844 F.3d 1152, 1158 (9th Cir. 2017). It exists to protect religious organizations from lawsuits that would

---

*Church in the Diocese*, 289 F.3d 648, 655–56 (10th Cir. 2002). But defendants refer to it as the "doctrine of ecclesiastical abstention," consistent with this Court's caselaw. *Puri v. Khalsa*, 844 F.3d 1152, 1162 (9th Cir. 2017).

amount to "government interference with [the selection or retention of a minister] that affects the faith and mission of the church itself" in violation of the Free Exercise Clause. *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171, 190 (2012). It also prevents the state from "determin[ing] which individuals will minister to the faithful" in violation of the Establishment Clause. *Id*. at 189. Accordingly, churches are exempt from most anti-discrimination suits related to the hiring and firing its ministers.

The Supreme Court has applied that exceptional defense only to employment discrimination claims. *See id*. at 195. Although this Court has observed that the exception applies to "any state law cause of action that would otherwise impinge on the church's" employment of its ministers, *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940, 950 (9th Cir. 1999), this Court has ever held that the defense itself creates a constitutional right to receive particular government benefits. Accordingly, the district court correctly concluded that plaintiff failed to state a claim for relief based on an expansion of an affirmative defense and was unlikely to succeed on the merits of that claim.

> **ii.     The doctrine of ecclesiastical abstention is a limitation on a civil court's authority and does not provide an independent basis to assert a claim against the state.**

32

The ecclesiastical abstention doctrine limits "the role of civil courts in the resolution of religious controversies that incidentally affect civil rights." *Puri*, 844 F.3d at 1162. The doctrine requires a civil court to accept the rulings of religious tribunals regarding "questions of discipline, or of faith, or ecclesiastical rule, custom, or law." *Watson v. Jones*, 80 U.S. 679, 727 (1871).

The doctrine is not absolute. Rather, it is a "qualified limitation" that requires courts to abstain from deciding "controversies over religious doctrine." *Puri*, 844 F.3d at 1164. But it does not prevent courts from deciding controversies involving religious organizations based on "neutral principals of law." *Id*. at 1165–66. Indeed, this court's "preference [is] to apply neutral principals to enforce secular rights where possible." *Id*. at 1167.

At bottom, the doctrine is a limitation on *courts*, and does not create a constitutional right for plaintiff to enforce against a state agency. Because plaintiff "do[es] not seek recourse to civil courts for resolution of a controversy over religious doctrine," it does not apply here. *Id*. Nor does plaintiff dispute the application of neutral law to enforce its secular rights under the First Amendment. Accordingly, the district court correctly concluded that plaintiff was unlikely to succeed on an "ecclesiastical abstention" theory.

Plaintiff argues that YDD and defendants violated its religious autonomy because the nondiscrimination policy extends to all employees and

"penalize[es]" plaintiff for exercising its religious hiring rights. (App. Br. 30). But although plaintiff relies on cases addressing the ministerial exception and doctrine of ecclesiastical abstention, it does not explain how those authorities demonstrate that the district court erred in concluding that it was unlikely to succeed on the "Church Autonomy and ministerial exception" claim in its complaint. Moreover, taken to its logical conclusion, plaintiff's argument would prohibit the government from enacting *any* laws that incidentally burden a religious organization's purported employment right. Accordingly, its arguments provide no basis for this court to reverse.

> **c. Plaintiff's expressive association claim is unlikely to succeed.**

The Free Speech provision of the First Amendment protects "the right to associate with others" for religious and other purposes. *Boy Scouts of America v. Dale*, 530 U.S. 640, 647 (2000). Governments may not force organizations to include members or leaders whose views are inconsistent with the organization. *See Dale*, 530 U.S. at 644 (holding that a public accommodation law requiring the Boy Scouts to accept a gay scoutmaster infringed on the group's expressive association right). But government action that does not compel association may permissibly regulate association. *See Frisby v. Schultz*, 487 U.S. 474, 488 (1988) (rejecting First Amendment challenge to a ban on picketing in front of a residence).

Although the First Amendment is implicated when the government provides an express benefit, such as grant funding, it has wider latitude to do so than in adopting legislation or regulations. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998) ("[T]he Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech * * * at stake. So long as [it] does not infringe on other constitutionally protected rights, [the Government] has wide latitude to set spending priorities."). Similarly, the First Amendment is implicated when the government provides access to funding conditioned on certain criteria. *See Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788 (1985) (evaluating government action excluding advocacy group from a federal workplace charitable gift); *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) (evaluating school funding for a religious group).

In both situations, whether a government benefit or action is unconstitutionally discriminatory depends on whether it is content and viewpoint neutral, and reasonable. *See Regan v. Taxation with Representation*, 461 U.S. 540, 550–51 (1983) (upholding content-neutral provision providing a tax benefit to organizations with the condition that they abstain from lobbying); *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 685 (2010) ("*Martinez*") (a public school's official

recognition of a student group is equivalent to a limited public forum; any conditions must be "viewpoint-neutral" and "reasonable in light of the purpose served by the forum"). Here, the non-discrimination requirement meets those requirements.

A nondiscrimination policy conditioning access to public funds is viewpoint neutral, *i.e.*, its purpose is not to impose an adverse impact upon a viewpoint. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994). Such a policy is content-neutral where it does not "seek to leverage funding to regulate speech." *Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). And it is reasonable where there is a government interest in ensuring nondiscrimination and does not eliminate an organization's ability to communicate its message. *Martinez*, 561 U.S. at 687–94.

In *Martinez*, the Supreme Court upheld a policy similar to the one at issue here. There, a public school denied official recognition—including funding and resources—to a student religious group that required members to agree to a statement of faith. *Id.* at 668. The school required the group to agree that its membership would be open to all students, "regardless of [their] status or beliefs." *Id.* at 675. The Court rejected the group's argument that the school had infringed upon its expressive association right by requiring it to accept members who do not share its beliefs, because it drew "no distinction between

groups based on their message or perspective," rendering it viewpoint-neutral, and because it was reasonable in light of the school's interest in providing education to all students, the school's nondiscrimination policy, and "state-law proscriptions on discrimination." *Id*. at 687–90.

Here, the nondiscrimination requirement is like the viewpoint- and content-neutral policy at issue in *Martinez*. It prevents YDD from funding organizations that discriminate on the basis of a protected class. It does not seek to regulate the speech of those organizations. Plaintiff is free to continue its religious-based employment practices, but YDD will not provide grant funding for its services. *See Agency for Int'l Dev.*, 570 U.S. at 214 (if an organization "objects to a condition on the receipt of [government] funding, its recourse is to decline the funds").

The nondiscrimination requirement is also reasonable in light of YDD's statutory purpose in providing services to youth at high risk of committing crimes. Or. Rev. Stat. § 417.852. YDD is committed to "equitable access, equal opportunity, and inclusion" and limits its funding to programs that further that "commitment" to equity. (2-ER-179). Ensuring that grant recipients provide an inclusive environment by not discriminating in its hiring practices is reasonably related to YDD's mission and does not offend the Constitution. The policy is also consistent with policies of the Oregon Department of Education

and state law.  (2-ER-179; *see also* Or. Admin. Rule 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 (Directing the department to consider "equitable outcomes" "when determining resource allocation")).  The district court correctly concluded that plaintiff was unlikely to succeed on its expressive-association claim.

### 2. The district court correctly determined that plaintiff is unlikely to suffer irreparable harm.

#### a. Plaintiff seeks a mandatory, rather than prohibitory, injunction.

Injunctions are either mandatory or prohibitory.  A mandatory injunction orders a party "to take action" while a prohibitory injunction "prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (2014).  "Mandatory preliminary relief, which goes well beyond simply maintaining the status quo *pendente lite*, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979).

In either case, "[t]he inquiry is whether the party seeking the injunction seeks to alter or maintain the status quo." *Fellowship*, 82 F.4th at 684.  "While there is no bright line rule for when a controversy arises * * * the status quo is the legally relevant relationship between the parties before the controversy arose." *Id*. (internal citation omitted).

Here, plaintiff did not seek merely a return to the status quo, but instead sought to have defendants upend grant agreements with other entities that have already been obligated and may already have been expended. When plaintiff was determined to be ineligible for grant funding, the next qualifying applicants moved up in priority and grant agreements were entered. (2-ER-180). The available funds for these grants have already been awarded. (2-ER-147).

Moreover, reinstating the grants that were conditionally awarded to plaintiff constitutes mandatory relief because it would require defendants to continue the grant process, affirmatively enter into contracts with plaintiff, award funds, and monitor those grants. (2-ER-178; 3-ER-384–85).

That kind of relief goes far beyond the prohibitory relief requested in *Fellowship*. There, as detailed in Section A, a religious club sought relief from a new policy enforcing a nondiscrimination rule after 20 years of the club's existence in the school district. 82 F4th at 673–77. That club sought a preliminary injunction ordering the district to reinstate its status as an official club. *Id*. at 677. This court held that the status quo was when the district changed its policy to enforce the rule. *Id*. at 684–85.

Here, by contrast, the status quo is not the point at which the conditional approval was revoked. YDD implemented the nondiscrimination requirement in 2022, well before plaintiff applied for new grant funding. (2-ER-178). And

if plaintiff had not misrepresented its eligibility, it would not have received the initial approval. If plaintiff had sought relief on the basis of being ineligible, the status quo would have been that plaintiff was *not* approved for grant funding. Plaintiff cannot now benefit from that conditional approval based its misrepresentation.[9]

### b. Plaintiff's alleged harms are not irreparable.

In the district court, plaintiff alleged that, without an injunction, its mission would be "curtail[ed]" because it would have to reduce staff or programming, and that future funding was "likely endangered" if other funders learned that YDD disqualified plaintiff from funding.[10] (SER 162–63). But the district court correctly found that those harms were not irreparable for three reasons.

---

[9] For the same reasons, the motions panel incorrectly concluded that YDD "'affirmatively changed' the legal relationship between the parties" after plaintiff "participated in the Program without issue for years." And even if YDD's adoption of the nondiscrimination requirement changed that legal relationship and created the current controversy, the status quo would be the level of grant funding previously awarded, not new grants. The record does not contain evidence of the amounts of prior grant funding.

[10] On appeal, plaintiff includes evidence that was not in the record before the district court in support of its argument that it demonstrated irreparable harm. (*See* App. Br. 37, citing 2-ER-22–26 (Declaration of Bud Amundsen in Support of Plaintiff's Motion for Injunction Pending Appeal)). Because that declaration was not before the district court, this court should decline to consider it.

First, the district court correctly characterized plaintiff's claim that its mission would be curtailed as a monetary injury because it concerned the loss of funding. And monetary injury is not normally considered to be irreparable harm. *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1202 (9th Cir. 1980).

Second, the district court correctly determined that plaintiff was not in danger of closure or dissolution, such as to demonstrate that it faced irreparable harm without the grant funding. (1-ER-16). Monetary injury can constitute irreparable harm where a plaintiff's future loss "cannot be fully compensated by subsequent monetary damages." *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 126 (2nd Cir. 1984). Accordingly, demonstrating that the party seeking an injunction is facing "a threat of 'extinction' is enough to establish irreparable harm, even when damages may be available." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (citing *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985)).

As noted, plaintiff argued in its motion that it might have to reduce staff or programming, which would impact its work, and that the loss of the grant might lead to the loss of other funding. (SER-163–64). But plaintiff alleged no

facts to support a finding that its organization was likely to—or even at risk of—permanently closing its doors.

Third, the district court correctly concluded that plaintiff had alleged a past discrete harm, rather than ongoing, future harm. (1-ER-17). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, * * * if unaccompanied by any continuing, present adverse effects. *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). Here, plaintiff offered only speculative evidence that it *might possibly* suffer future harms, if other funders decided—at some future unknown date—to no longer fund its organization. *Winter*, 555 U.S. at 22 (the "possibility of harm" is insufficient to demonstrate irreparable harm and "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely*") (emphasis in original).

Moreover, plaintiff waited four months to file a complaint and seek preliminary injunctive relief after defendants denied its grant application. (2-ER-147; 3-ER-423). That delay "implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). *See also Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc) (the plaintiff failed to demonstrate irreparable harm after waiting five months after a YouTube video was posted to seek to enjoin Google

to take it down); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (affirming the district court's ruling that the plaintiff failed to demonstrate irreparable harm given its unexplained five-month delay in seeking a preliminary injunction).

To be sure, alleging a First Amendment violation carries a presumption of continuing harm. *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009). But, under the heightened standard applied by this Court due to the mandatory relief plaintiff requested, it failed to demonstrate the kind of injury such as to require an injunction.

### 3. The balance of equities and public interest do not favor an injunction.

To prevail on a preliminary injunction against state entities, a plaintiff must also show "the balance of equities tips in [its] favor; and * * * an injunction is in the public interest." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018). Because state officials are parties, these factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the balance of the equities and the public interest disfavor an injunction. As argued above, plaintiff sought a sweeping mandatory injunction to force YDD to enter into contracts, disburse money to plaintiff, and monitor the new grant award. The grant funds that plaintiff seeks have been awarded and allocated to other applicants. Defendants would be required to recoup those

43

funds in some fashion, or to spend additional money beyond that appropriated for these grants long before the court reaches a final determination on the merits. Accordingly, those factors tip sharply in favor of the defendants. *Cf. Camelot Banquet Rooms, Inc., v. United States Small Bus. Admin.*, 14 F.4th 624, 633–34 (7th Cir. 2021) (the fact that the government would be unable to recover funds "[i]f [it] were erroneously required to guarantee subsidized loans to [the plaintiff]" weighed against issuing an injunction pending appeal).

**B.    The district court correctly dismissed the claims for damages against defendants in their individual capacities, but defendants agree that the court erred in dismissing the official-capacity claims.**

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted). Courts may address those two prongs in any order. *Id*. "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Id*. at 743 (internal quotation marks omitted).

For all of the reasons set out in section A that plaintiff is unlikely to succeed on the merits of his claims, plaintiff cannot show that defendants violated plaintiff's First Amendment rights. But even if plaintiff had met that

initial burden, the district court correctly dismissed the individual-damages claims because plaintiff cannot demonstrate that defendants violated a *clearly established* right.

### 1.     Plaintiff's free-exercise claim is not clearly established.

To be clearly established, the right in question must be "sufficiently clear that *every reasonable official* would have understood that what he is doing violated that right." *Anderson v. Creighton*, 483 U.S. 635, 40 (1987) (emphasis added). The right must be "particularized" to the facts of the case. *White v. Pauly*, 580 U.S. 73, 79 (2017). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity * * * into a rule of virtually unqualified liability" simply by alleging violation of extremely abstract rights. *Anderson*, 483 U.S. at 639–40.

Although the basic, overarching principles of First Amendment law are well settled, it is not at all apparent how *application* of those principles would be obvious to a reasonable official who encountered the specific circumstances that defendants faced in this case. The Supreme Court has applied those well-settled principles to establish that the state may not discriminate "solely" on the basis of religion. *See Trinity Lutheran*, 582 U.S. 449, *Espinoza*, 591 U.S. 664, and *Carson*, 596 U.S. 767. But those cases do not demonstrate that a non-

discrimination grant-funding requirement that *incidentally* affects religious

hiring practices would offend the First Amendment.

Nor does *Fellowship* establish that such a requirement is not generally

applicable and neutral. As set out above, *Fellowship* involved a student club-

approval process that excluded a religious club after the school district chose to

enforce its non-discrimination rule after years of non-enforcement and adopt a

new rule that precluded the club's recognition. 82 F4th at 673–75. The

approval process itself provided for an individualized exemption to that rule.

*Id*. at 687. And extensive evidence demonstrated that the district applied the

rule in a hostile manner to the religious club but exempted secular clubs from

discriminating based on other protected classes. *Id*. at 75–77, 692. It would not

have been obvious that a new nondiscrimination rule for grant funding

applications—applied to all applicants without individual exceptions and

adopted to bring ODE and YDD in line with other state agencies and promote

equity—would run afoul of the First Amendment.

First Amendment cases, and in particular religious free-expression cases,

are decided on case-specific factual distinctions applied to complex and

evolving legal principles. Accordingly, it would not have been obvious to a

reasonable official reviewing that general body of law that the requirement at

issue here would offend that right. *See Healy v. James*, 408 U.S. 169, 170–71

46

(1972) (observing that, although the case implicated the "well-established First Amendment principles[,] * * * the factual background of this particular case raises these constitutional issues in a manner not heretofore passed on by the Court").

### 2.  Plaintiff's remaining claims are not clearly established.

Plaintiff's remaining claims are similarly unestablished.  As argued in section A(1)(b), neither this Court nor the Supreme Court has ever held that the ministerial exception and the ecclesiastical doctrine, considered together, provide an affirmative employment right that allows plaintiff to seek damages against government.  That alone is sufficient to support the district court's ruling as to that claim.  *See Al-Kidd*, 563 U.S. at 741 (To avoid qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate").

 Similarly, plaintiff's free-expression claim is not clearly established.  As argued above, the Supreme Court rejected such a claim regarding a policy similar to that at issue here in *Martinez*, 561 U.S. at 687–90.  Accordingly, any expressive-association violation is not clearly established.

In sum, the district court correctly granted defendants' limited motion to dismiss the individual-capacity claims seeking damages but erred in dismissing

47

the official-capacity claims seeking declaratory and injunctive relief, because

defendants did not move to dismiss those claims.

## CONCLUSION

The district court's order denying the preliminary injunction should be

affirmed. The district court's judgment dismissing plaintiff's claims seeking

damages from defendants in their individual capacities should be affirmed.

This Court should reverse the judgment as to plaintiff's declaratory and

injunctive claims, and remand back to the district court for further proceedings.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General
BENJAMIN GUTMAN
Solicitor General


/s/ Kirsten M. Naito
_____
KIRSTEN M. NAITO  #114684
Assistant Attorney General
kirsten.m.naito@doj.oregon.gov

Attorneys for Defendants-Appellees
Charlene Williams, Brian Detman and
Cord Bueker, Jr.

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Federal Rules of Appellate Procedure, I certify that the Appellees' Brief is proportionately spaced, has a typeface of 14 points or more and contains 10,122 words.

DATED: September 13, 2024

/s/ Kirsten M. Naito

KIRSTEN M. NAITO #114684
Assistant Attorney General
kirsten.m.naito@doj.oregon.gov

Attorney for Defendants-Appellees
Charlene Williams, Brian Detman and
Cord Bueker, Jr.

ELLEN F. ROSENBLUM
Attorney General
BENJAMIN GUTMAN
Solicitor General
KIRSTEN M. NAITO
Assistant Attorney General
1162 Court St.
Salem, Oregon 97301
Telephone: (503) 378-4402

Counsel for Appellees

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | |
|---|---|
| YOUTH 71FIVE MINISTRIES, | |
| Plaintiff-Appellant, | U.S.C.A. No. 24-4101 |
| v. | |
| CHARLENE WILLIAMS, Director of the Oregon Department of Education, in her individual and official capacities; et al., | STATEMENT OF RELATED CASES |
| Defendants-Appellees. | |

Pursuant to Rule 28-2.6, Circuit Rules of the United States Court of

Appeals for the Ninth Circuit, the undersigned, counsel of record for Appellees,

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

certifies that she has no knowledge of any related cases pending in this court.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General
BENJAMIN GUTMAN
Solicitor General


/s/  Kirsten M. Naito
KIRSTEN M. NAITO  #114684
Assistant Attorney General
kirsten.m.naito@doj.oregon.gov

Attorneys for Defendants-Appellees
Charlene Williams, Brian Detman and
Cord Bueker, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2024, I directed the Appellees'

Brief to be electronically filed with the Clerk of the Court for the United States

Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

/s/ Kirsten M. Naito
KIRSTEN M. NAITO #114684
Assistant Attorney General
kirsten.m.naito@doj.oregon.gov

Attorney for Defendants-Appellees
Charlene Williams, Brian Detman and
Cord Bueker, Jr.

KMN:kw5/972809118