APPEAL NO. 24-4101

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

YOUTH 71FIVE MINISTRIES,

*Plaintiff-Appellant,*

v.

CHARLENE WILLIAMS, Director of the Oregon Department of Education, in her individual and official capacities, et al.

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Oregon
Case No. 1:24-cv-00399-CL

## PETITION FOR REHEARING EN BANC

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@adflegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@adflegal.org

James A. Campbell
Jeremiah Galus
Ryan J. Tucker
Mark Lippelmann
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jcampbell@adflegal.org
jgalus@adflegal.org
rtucker@adflegal.org
mlippelmann@adflegal.org

*Counsel for Appellant*

## DISCLOSURE STATEMENT

Youth 71Five Ministries is a religious, nonprofit corporation with no parent corporations or stock.

# TABLE OF CONTENTS

Disclosure Statement ...................................................................... i

Table of Authorities.................................................................... iv

FRAP 40 Statement ...................................................................... 1

Background...................................................................................... 3

    A.   Factual Background ............................................................ 3

    B.   Procedural Background..................................................... 5

Argument........................................................................................ 8

I.   The panel majority's free-exercise analysis contradicts Supreme Court and Ninth Circuit precedent. ......................... 8

    A.   Excluding 71Five for hiring only coreligionists conflicts with *Trinity Lutheran*, *Espinoza*, and *Carson*. ...................... 8

    B.   Penalizing 71Five while letting secular grantees discriminate conflicts with *FCA*. ........................................ 10

    C.   Scrutinizing 71Five more than secular grantees conflicts with Supreme Court neutrality precedent............. 12

II.   The panel's holding that 71Five cannot affirmatively assert a church-autonomy claim conflicts with Supreme Court, Ninth Circuit, and other circuit precedent................................................ 14

III.   The panel's expressive-association analysis conflicts with Supreme Court precedent analyzing the constitutionality of funding conditions. ....................................................................... 16

IV.   Dismissing 71Five's damages claims with prejudice conflicts with the panel's own conclusion that discovery may show the Department violated clearly established law. ............................... 19

Conclusion ................................................................................... 20

Certificate of Compliance.........................................................................21

Certificate of Service ...............................................................................22

Addendum ..................................................................................................1

# TABLE OF AUTHORITIES

## Cases

*Agency for International Development v. Alliance for Open Society International, Inc.,*
570 U.S. 205 (2013) ..................................................... 3, 16, 17, 18

*Ames v. Ohio Department of Youth Services,*
605 U.S. 303 (2025) ............................................................. 12

*Bates v. Pakseresht,*
146 F.4th 772 (9th Cir. 2025) ................................................. 8

*California ex rel. Becerra v. Azar,*
950 F.3d 1067 (9th Cir. 2020) .............................................. 18

*Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission,*
605 U.S. 238 (2025) ........................................................ 9, 14

*Christian Healthcare Centers, Inc. v. Nessel,*
117 F.4th 826 (6th Cir. 2024) ............................................ 2, 15

*Christian Legal Society v. Martinez,*
561 U.S. 611 (2010) ........................................................... 18

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ................................................. 2, 9, 12, 13

*Commonwealth v. Beshear,*
981 F.3d 505 (6th Cir. 2020) ............................................... 15

*Conlon v. InterVarsity Christian Fellowship,*
777 F.3d 829 (6th Cir. 2015) ............................................... 16

*Edwards v. Aguillard,*
482 U.S. 578 (1987) ............................................................. 9

*Espinoza v. Montana Department of Revenue,*
591 U.S. 464 (2020) ............................................................. 2

iv

*F.C.C. v. League of Women Voters of California,*
    468 U.S. 364 (1984) ....................................................................... 18

*Fellowship of Christian Athletes v. San Jose Unified School District Board of Education,*
    82 F.4th 664 (9th Cir. 2023)..................................... 2, 10, 11, 12, 13

*Flathead-Lolo-Bitteroot Citizen Task Force v. Montana,*
    98 F.4th 1180 (9th Cir. 2024)......................................................... 6

*Griggs v. Duke Power Co.,*
    401 U.S. 424 (1971) ....................................................................... 12

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
    565 U.S. 171 (2012) ....................................................................... 14

*InterVarsity Christian Fellowship/USA v. Board of Governors of Wayne State University,*
    534 F. Supp. 3d 785 (E.D. Mich. 2021) ........................................ 16

*Kennedy v. Bremerton School District,*
    597 U.S. 507 (2022) ....................................................................... 13

*Locke v. Davey,*
    540 U.S. 712 (2004) ....................................................................... 18

*Mahmoud v. Taylor,*
    145 S. Ct. 2332 (2025) ..................................................................... 8

*Our Lady of Guadalupe School v. Morrissey-Berru,*
    591 U.S. 732 (2020) ................................................................... 2, 14

*Reed v. Reed,*
    404 U.S. 71 (1971) ......................................................................... 12

*Rosenberger v. Rector & Visitors of University of Virginia,*
    515 U.S. 819 (1995) ................................................................. 17, 19

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
    547 U.S. 47 (2006) ......................................................................... 18

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ........................................................................ 17

*Seattle Pacific University v. Ferguson,*
    104 F.4th 50 (9th Cir. 2024) ..................................................... 2, 15

*Tandon v. Newsom,*
    593 U.S. 61 (2021) ........................................................................ 12

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) ........................................................................ 1

*Union Gospel Mission of Yakima Washington v. Ferguson,*
    No. 23-2606, 2024 WL 3755954 (9th Cir. Aug. 12, 2024) .......... 2, 15

*United States v. American Library Association,*
    539 U.S. 194 (2003) ....................................................................... 18

## **Statutes**

42 U.S.C. § 1983 ................................................................................. 15

42 U.S.C. § 2000e ................................................................................. 9

Or. Rev. Stat. § 659A.006 ..................................................................... 9

## **Other Authorities**

Black Parent Initiative, About BPI ..................................................... 11

## **Regulations**

Or. Admin. R. 423-110-0015 ................................................................ 18

## FRAP 40 STATEMENT

En banc review is needed to correct a panel ruling that contradicts binding precedent, strips religious organizations of constitutional rights, and allows the government to punish religious groups for hiring according to their faith.

Youth 71Five Ministries ("71Five") is a Christian, youth-mentoring ministry that has participated in Oregon's Youth Community Investment Grant Program for many years without issue. It was again awarded grants for the 2023-25 grant cycle. But in late 2023, state officials kicked 71Five out of the Program and stripped it of over $400,000 in grant awards. Why? Because an anonymous person complained that 71Five hires employees who share its Christian faith.

The district court denied 71Five's request for a preliminary injunction and instead dismissed the entire lawsuit based on qualified immunity, even the official-capacity claims for prospective relief. But a motions panel of this Court stepped in and unanimously granted an emergency injunction because Oregon allows secular grantees to discriminate in violation of the same rule it relied on to deny funding to 71Five. The merits panel disagreed and significantly cut back on the emergency injunction. In its view, 71Five's can employ coreligionists *only* in programs that receive no government funding. Because that contradicts Supreme Court, Ninth Circuit, and other circuit precedents, further review is needed.

First, the panel majority's free-exercise analysis applied the wrong legal test, conflicting with *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017), *Espinoza v. Montana Department of*

1

*Revenue*, 591 U.S. 464 (2020), and *Carson v. Makin*, 596 U.S. 767 (2022). That precedent forbids excluding religious observers from benefit programs based on their religious character or exercise. The opinion also contradicts this Court's en banc decision in *Fellowship of Christian Athletes v. San Jose Unified School District Board of Education* ("*FCA*"), 82 F.4th 664 (9th Cir. 2023), which forbids punishing religious organizations for preferring coreligionists while allowing secular organizations to favor certain protected groups over others. And the panel's conclusion that government officials may scrutinize religious organizations more closely than secular ones contradicts Supreme Court precedent forbidding even subtle departures from neutrality, including *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993).

The panel's cramped view of the church-autonomy doctrine is also legal error and demands further review. The panel's holding that plaintiffs cannot assert church-autonomy claims against legislative or executive action contradicts Supreme Court precedent protecting religious organizations against "any attempt by government" to interfere with their "independence in matters of faith and doctrine." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). It also conflicts with § 1983's text and purpose, and with the decisions of this Court and other circuits allowing such claims, including: *Seattle Pacific University v. Ferguson*, 104 F.4th 50 (9th Cir. 2024); *Union Gospel Mission of Yakima Washington v. Ferguson*, No. 23-2606, 2024 WL 3755954 (9th Cir. Aug. 12, 2024); and *Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826 (6th Cir. 2024).

2

Finally, the panel's expressive-association analysis also applies the wrong legal test and contradicts Supreme Court precedent, which deems a funding condition unconstitutional when it "seek[s] to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). The panel agreed the condition here did so but wrongly rewrote it to cover only grant-funded initiatives. 71Five's staff serves every part of the ministry, and as a youth-mentoring organization, its people and programs are inseparable. 71Five cannot hire nonbelievers for *any* program without affecting the ministry's Christian mission and message across the board. The panel's decision to limit the injunction to non-grant-funded programs ignores this reality and offers no real relief.

Any one of these legal errors warrants en banc review. All of them compel it. The Court should grant the petition.

## BACKGROUND

### A.    Factual Background

71Five is a Christian, nonprofit youth-mentoring ministry that provides at-risk youth with free mentoring, vocational training, and recreational activities. 3-ER-195–96. 71Five welcomes youth of all faiths and does not require participation in any religious activities (such as Bible studies) as a condition to receiving its free services. 3-ER-196, 235.

3

71Five has participated in Oregon's Youth Community Investment Grant Program for years without issue. 3-ER-201–02. That Program, administered by the state's Department of Education, provides reimbursement grants to support existing services for youth. 2-ER-23, 3-ER-201. 71Five has used prior grant awards to purchase needed supplies and equipment and to cover personnel and operating costs. 3-ER-202.

71Five was awarded $410,000 for the 2023-25 cycle. 3-ER-202. But for the first time ever, the Department required applicants to certify they do not "discriminate" in their "employment practices" or "service delivery" based on "race, ethnicity, religion, age, political affiliation, gender, disability, sexual orientation, national origin or citizenship status" (the "Rule"). 3-ER-204, 345. 71Five believed it complied, since it serves everyone and did not view the provision as requiring it to abandon its constitutionally protected hiring practices. 3-ER-234–35. But when an anonymous person complained that 71Five's website says the ministry hires coreligionists (which has always been true), the Department invoked the Rule, rescinded 71Five's grant awards, and kicked the ministry out of the Program. 2-ER-180, 3-ER-236–38. At the same time, the Department gave a free pass to secular grantees whose websites admit they discriminate when providing their services. 2-ER-101–44.

### B.    Procedural Background

**District Court.** 71Five sued, alleging violations of its First Amendment rights to free exercise, religious autonomy (including its ministerial hiring rights), and expressive association. 3-ER-241–46. The complaint sought declaratory and injunctive relief, plus nominal and compensatory damages, and it named the relevant officials in their individual and official capacities. 3-ER-222–23, 247.

71Five moved for a preliminary injunction to be reinstated into the Program and prevent the Department from enforcing the Rule against 71Five in current and future grant programs. The officials moved to dismiss *only* the individual-capacity damages claims based on qualified immunity. 3-ER-423–27. The district court denied 71Five's motion, granted the officials', and dismissed the entire case "with prejudice"—even the official-capacity claims. 1-ER-20.

**Motions Panel.** A motions panel held 71Five is likely to succeed on its free-exercise claim and granted an emergency injunction. Order Granting Mot. for Emergency Inj. Pending Appeal ("Em. Inj. Order"), ECF No. 18. The motions panel determined the Department has likely not acted "neutrally" because "it continues to fund secular organizations that favor certain groups based on race and gender identification in violation of the same non-discrimination policy that [it] relied on in denying funding to 71Five." *Id.* at 2. Such unequal treatment, the

5

motions panel explained, puts this case "well within the heartland of [this Court's] en banc decision in *FCA*." *Id.* at 8–9.

**Merits Panel.** The merits panel disagreed with the motions panel. It held 71Five is unlikely to succeed on its free-exercise claim because the Rule is "neutral and generally applicable." Op. 13. In so holding, the panel said the Rule did not exclude 71Five based on its religious character or exercise, and it rejected the argument that the Department failed to act neutrally by scrutinizing 71Five's website while ignoring the websites of secular grantees. Op. 14.

The panel also faulted 71Five for introducing the secular grantees' websites in a reply brief, though it held the evidence did not change the outcome. Op. 17–23.[1] Those websites showed secular grantees openly favor groups based on race and gender. Yet the panel majority upheld the district court's view that targeting "particular demographics" in "culturally responsive ways" is not "discrimination." 1-ER-9; Op. 19–20.

---

[1] It was proper to consider the evidence. The Department "had an opportunity to respond" below, *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1188 (9th Cir. 2024), and it did so both in briefing and at oral argument, 2-ER-53–57, 89–91. The complaint also alleged the Department had not "applied or enforced" the Rule "consistently." 3-ER-245. And the Department admitted that websites were one way it determined a group's compliance, so it had the burden of reviewing all grantees' websites in the same manner.

Judge Rawlinson disagreed on that point, writing separately that if the evidence were considered, she would side with the motions panel. Op. 41. She refused to join the majority's analysis because it "relies heavily" on the "mistaken" premise that 71Five's website "evidenced discrimination" but secular grantees' websites "did not." Op. 41.

The panel then rejected 71Five's religious-autonomy claim, insisting the right to religious (or church) autonomy serves only as a restraint on "*judicial* authority" and cannot be raised as an affirmative claim against legislative or executive action. Op. 26.

On expressive association, the panel drew an unworkable line, both legally and factually. It found the Rule is "likely a permissible burden on 71Five's expressive association" for "Department-funded initiatives," but likely unconstitutional in that it reached "all employees" and "every aspect of its ministry." Op. 35–36. The panel then ordered a narrow injunction—protecting 71Five's right to employ coreligionists only in "initiatives" that receive no grant funding. Op. 40.

Finally, the panel reinstated 71Five's official-capacity claims, but upheld dismissal of its individual-capacity damages claims with prejudice, Op. 36–40—even while noting discovery may show the Department can grant exemptions or has enforced the Rule "in a discriminatory manner," Op. 20, 23, 35.

# ARGUMENT

## I.    The panel majority's free-exercise analysis contradicts Supreme Court and Ninth Circuit precedent.

### A.    Excluding 71Five for hiring only coreligionists conflicts with *Trinity Lutheran*, *Espinoza*, and *Carson*.

The panel held that *Trinity Lutheran*, *Espinoza*, and *Carson* do not apply because the Rule "does not deny funding based on a practice exclusive to religious organizations" and is thus "neutral." Op. 14–15.

That's the wrong legal test. "A facially neutral law need not exclusively burden religious persons to be regarded as non-neutral in operation." *Bates v. Pakseresht*, 146 F.4th 772, 795 (9th Cir. 2025). And the Supreme Court has held a state cannot impose a funding condition that "operates to identify and exclude otherwise eligible" religious institutions based on their "religious character" or "exercise." *Carson*, 596 U.S. at 780, 789 (discussing *Trinity Lutheran* and *Espinoza*). That's true "[r]egardless of how the benefit and restriction are described." *Id.* at 789; *see also Mahmoud v. Taylor*, 145 S. Ct. 2332, 2359 (2025) ("availability" of a "public benefit" could not be conditioned on "parents' willingness to accept a burden on their religious exercise," even under a neutral and generally applicable rule).

In *Carson*, Maine argued its tuition-funding condition turned on what a school does—whether it "promotes" a particular faith—rather than its "religious status." 596 U.S. at 787. The Court rejected that argument, holding the condition violates the Free Exercise Clause. *Id.*

8

at 789. That was so even though the condition didn't "deny funding based on a practice exclusive to religious organizations." Op. 14. Indeed, secular schools might also "advance a religious doctrine" or present "a religious viewpoint," *Edwards v. Aguillard*, 482 U.S. 578, 596 (1987) (striking down law requiring teaching of creationism in public schools)—just like secular employers might discriminate based on religion, Op. 15. What mattered in *Carson* was that Maine conditioned an otherwise available benefit on giving up protected practices that "lie at the very core of the mission of a private religious school." 596 U.S. at 787.

Same here. The Rule forces 71Five to abandon an employment practice at the "very core" of its mission. True, "[g]overnment agencies" and "secular corporations" might discriminate based on religion, Op. 14, but that is unlawful and irrelevant to their missions. Not so for 71Five, whose right to hire coreligionists is legally protected and essential. *See* 42 U.S.C. § 2000e-1(a); Or. Rev. Stat. § 659A.006(4). Put differently, the Rule "in its real operation" uniquely impacts and excludes religious organizations like 71Five. *Lukumi*, 508 U.S at 535. And by forbidding the "exclusive [hiring] of co-religionists," the Rule impermissibly "differentiat[es] between religions based on theological choices." *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 250 (2025).

9

Because the panel opinion "overlooks the reality that policies such as Oregon's ... implicate uniquely religious matters that prove most problematic" for religious organizations like 71Five, *Bates*, 146 F.4th at 795, the Court should grant the petition.

### B.   Penalizing 71Five while letting secular grantees discriminate conflicts with *FCA*.

Review is also needed because the panel majority's free-exercise analysis conflicts with this Court's en banc decision in *FCA* and the unanimous motions panel opinion.

In *FCA*, the Court held that a school district's nondiscrimination policies were not neutral and generally applicable—and thus triggered strict scrutiny—where the district prohibited a religious student group from requiring its leaders to be Christians while a secular group could "*prioritize* acceptance of south Asian students." 82 F.4th at 678 (emphasis added). "[T]he government," the Court explained, "may not treat comparable secular activity more favorably than religious exercise." *Id.* at 686 (citation modified).

That principle controls here. As the motions panel (and Judge Rawlinson on the merits panel, Op. 41) recognized, the Department treats comparable secular activity more favorably than 71Five's religious exercise by "continu[ing] to fund many groups that discriminate" in violation of the "same non-discrimination policy that [it] relied on in denying funding to 71Five." Em. Inj. Order 2, 4.

10

For example, one grantee serves "youth who have experienced girlhood," and limits some positions to "female-identifying staff to maintain [its] mission of providing a safe space for girls." 2-ER-103, 110 ("Why not boys?"). Another, Black Parent Initiative, is "focused *solely* on supporting Black/African American families." Black Parent Initiative, About BPI, https://perma.cc/7LSW-6CFP (emphasis added); *see also* 2-ER-101, 113. These secular grantees, and others, openly admit to "favor[ing] certain groups based on race and gender identification," yet continue to receive funding. Em. Inj. Order 2. That puts this case "well within" *FCA. Id.* at 8–9

The panel majority discredited this evidence, claiming it was "ambiguous" about whether grantees "categorically exclude" anyone "based on protected characteristics." Op. 20–21. And it said that distinguished *FCA* because the south Asian student club there "restrict[ed] who gets in the door." Op. 22. That's incorrect: the club didn't exclude anyone; it "prioritized" south Asian members over others. *FCA*, 82 F.4th at 678. In fact, the record there shows the club was "fine with non-south [A]sians joining." 2-ER-109, *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, No. 22-15827, ECF No. 22-3.

So *FCA* applies either way—whether secular grantees categorically exclude some protected groups or just prefer others. That's because the Rule broadly forbids discrimination, and (even setting aside the website evidence) the Department admits secular grantees can prefer

11

some groups over others or "even publicly disavow that they will serve certain groups." Appellees' Br. 24. That is discrimination under Supreme Court and Ninth Circuit precedent,[2] so the panel majority was wrong to say the secular grantees' practices are not "comparable" to 71Five's employment practices. Op. 22.

Comparability is "judged against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). And by not serving some youth based on circumstances they can't control, the secular grantees undermine the government's asserted interest far more than 71Five, which serves everyone. As the Department admits, "[s]ervice delivery is about who participates in the grant funding; hiring is not." Appellees' Br. 25.

## C. Scrutinizing 71Five more than secular grantees conflicts with Supreme Court neutrality precedent.

The Supreme Court has repeatedly held that the Free Exercise Clause "forbids subtle departures from neutrality" and "covert suppression of particular religious beliefs." *Lukumi*, 508 U.S. at 534. So the

---

[2] *E.g.*, *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303 (2025) (same standard applies to "majority group" discrimination claims); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971) ("Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed [in Title VII]."); *Reed v. Reed*, 404 U.S. 71, 77 (1971) ("mandatory preference to members of either sex over members of the other" violates the Equal Protection Clause); *accord FCA*, 82 F.4th at 688 (favoring some groups is "facially discriminat[ory]").

12

panel also erred by holding that the Department acted neutrally in scrutinizing 71Five's website while ignoring secular grantees' websites.

The panel majority excused this unequal treatment because an "anonymous" person complained about 71Five's website and there was "no evidence" of similar complaints about secular grantees. Op. 14. But that's no answer. The Department concedes it must "monitor[ ]" every "grantee's programs." 2-ER-178. And it has done nothing since being alerted to the secular grantees' violations over a year ago, choosing instead to "look[] the other way." Em. Inj. Order 4.

Nor can the Department justify treating 71Five more harshly because secular grantees "certified" they don't "discriminate." 71Five made that same certification, yet it alone was singled out for "closer scrutiny." *FCA*, 82 F.4th at 705 (Forrest, J., concurring).

If the Department monitors websites for Rule compliance, and it obviously does, then it must do so evenly. And it cannot target 71Five alone because an anonymous person disagreed with the ministry's legally protected hiring practices. *Cf. Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) ("protected speech or religious exercise" does not "readily give way to a 'heckler's veto'"). The First Amendment forbids "proposals for state intervention" when there is "even slight suspicion" they "stem from animosity to religion or distrust of its practices." *Lukumi*, 508 U.S. at 547.

13

## II. The panel's holding that 71Five cannot affirmatively assert a church-autonomy claim conflicts with Supreme Court, Ninth Circuit, and other circuit precedent.

The Department does not dispute that the Religion Clauses protect 71Five's right to religious autonomy to select ministers and employees who share its faith. Appellees' Br. 29–33. Yet the panel, like the district court, held 71Five cannot assert that right under § 1983. Op. 26. It believed "religious-autonomy doctrines" serve only "as defenses against or limits upon plaintiffs' invocation of *judicial* authority" and cannot support "standalone claims challenging legislative or executive action." *Id.* (emphasis in original). That view conflicts with Supreme Court, Ninth Circuit, and other circuit precedent.

The Supreme Court has explained the church-autonomy doctrine guards against "any attempt by government" or "secular authorities" to interfere with a religious organization's "independence in matters of faith and doctrine." *Our Lady of Guadalupe*, 591 U.S. at 746–48; *accord Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 184 (2012) ("the Government"); *Cath. Charities Bureau, Inc.*, 605 U.S. at 255 (Thomas, J., concurring) ("state interference"). The panel didn't explain why that explanation should be read to protect against only "judicial authority." Op. 26. It just said there was no precedent "suggesting" church-autonomy rights can be asserted under § 1983. Op. 26.

14

That's wrong. This Court and other circuits have allowed church-autonomy claims under § 1983. *E.g.*, *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50 (9th Cir. 2024) (challenging state law that forbids hiring coreligionists); *Union Gospel Mission of Yakima Wash. v. Ferguson*, No. 23-2606, 2024 WL 3755954 (9th Cir. Aug. 12, 2024) (same); *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 852–55 (6th Cir. 2024) (same); *see also Commonwealth v. Beshear*, 981 F.3d 505, 510 (6th Cir. 2020) (adjudicating claim that COVID-19 restrictions intruded "into the autonomy of religious institutions"). And numerous lower-court cases asserting such claims confirm the doctrine's vital role in restraining executive and legislative overreach. *See* Addendum (listing cases). The panel's ruling creates intra- and inter-circuit conflicts.

What's more, the panel opinion contradicts the plain language and purpose of § 1983, which grants a cause of action for constitutional violations. Under that federal law, private parties may sue state officials for the "deprivation of *any* rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983 (emphasis added).

Finally, the panel's suggestion that 71Five's position is not supported by "historical practices [or] understandings" is mistaken. Op. 26. Our founders "feared government encroachments in far more contexts, and with far greater severity, than lawsuits and employment disputes." *InterVarsity Christian Fellowship/USA v. Bd. of Governors of Wayne State Univ.*, 534 F. Supp. 3d 785, 806 (E.D. Mich. 2021). There is "no

15

historical example" of our founders allowing the government "to order a religious organization to accept or retain" an unwanted minister. *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 835–36 (6th Cir. 2015). To the contrary, "the historical practice has always been that the government cannot dictate to a religious organization who its spiritual leaders would be." *Id.*

## III. The panel's expressive-association analysis conflicts with Supreme Court precedent analyzing the constitutionality of funding conditions.

The panel correctly found the Rule would "significant[ly]" impair 71Five's expression by forcing it to "speak through individuals who reject its message." Op. 27–29. It also admitted the Rule regulates expression "outside the contours" of the Program, reaching "all 71Five's employees and every aspect of its ministry," including projects with no grant funding. *Id.* at 35–36. That should have ended the analysis.

In the free-speech context, a funding condition may "define the limits of the government spending program," but it may not "leverage funding to regulate speech *outside* the contours of the program itself." *Agency for Int'l Dev.,* 570 U.S. at 214–15 (emphasis added). By its own findings, the panel confirmed the Rule does exactly that. Op. 35. It is unconstitutional as applied to 71Five.

Rather than say so, the panel rewrote the Rule. It barred enforcement against 71Five's faith-based practices in "initiatives that receive

16

no [Department] funding," Op. 36, but then imagined a rule confined to funded initiatives and upheld that fictional version as likely constitutional. Op. 30. To reach that result, the panel recast the Program as "a limited public forum" and said the Rule is a "reasonable and viewpoint neutral" restriction that "equally burdens" all grantees. Op. 30–34. The panel used the wrong legal test and applied it incorrectly.

First, courts must assess funding conditions as written and applied, not imagined. And this Rule plainly is an unconstitutional "condition on the *recipient* of the subsidy rather than on a particular program or service." *Rust v. Sullivan*, 500 U.S. 173, 197 (1991).

Second, 71Five's employees serve every aspect of the ministry, and they must all be ready and able to share the gospel and to participate "in regular times of prayers, devotion, and worship." 3-ER-199. Employing nonbelievers in *any* program negatively impacts 71Five's entire mission and message, so even the panel's rewritten Rule "cannot be confined within the scope of the [grant] program." *Agency for Int'l Dev.*, 570 U.S. at 221. The panel's narrow injunction ignores this reality and offers no real relief.

Third, the public-forum doctrine applies only when the government creates "a forum for speech." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 840 (1995). And here, the Program's purpose is not to "encourage a diversity of views from private speakers," *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 206 (2003) (plurality opinion),

but to "[e]stablish or support programs for, and provide services to, youth who are at risk," Or. Admin. R. 423-110-0015(1)(a). "[P]ublic forum principles" are thus "out of place in the context of this case." *Am. Libr. Ass'n*, 539 U.S. at 205. The panel's reliance on *Christian Legal Society v. Martinez*, 561 U.S. 611 (2010), is therefore misplaced (*see* Op. 31–32), and conflicts with numerous Supreme Court and Ninth Circuit precedents analyzing funding conditions without resorting to public-forum analysis.[3]

Fourth, the Rule is not viewpoint neutral even under the panel's incorrect legal test. Forcing 71Five to hire employees and volunteers who reject its faith alters the viewpoint of its message. As the panel acknowledged, "71Five wants its spokespeople to affirm the very message they are tasked with communicating on its behalf," but the Rule "prohibits it from doing so." Op. 29. That's a viewpoint-based restriction. And it does not become neutral simply because it might also ban antireligious expression. *Contra* Op. 35. The Supreme Court has rejected such reasoning: "it is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one." *Rosenberger*, 515 U.S. at 831.

---

[3] *E.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013); *Rumsfeld v. FAIR*, 547 U.S. 47 (2006); *Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004); *United States v. Am. Libr. Ass'n*, 539 U.S. 194 (2003); *F.C.C. v. League of Women Voters of California*, 468 U.S. 364 (1984); *Cal. ex rel. Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020).

18

IV. **Dismissing 71Five's damages claims with prejudice conflicts with the panel's own conclusion that discovery may show the Department violated clearly established law.**

The panel also wrongly upheld dismissal of 71Five's damages claims with prejudice based on qualified immunity. Even while recognizing that a "fuller record" could show the Department "has discretion to grant exemptions" or has enforced the Rule "in a discriminatory manner," Op. 20, 23, 35, the panel affirmed dismissal "with prejudice." Op. 39. That legal error unfairly prejudices 71Five. If the panel thought the complaint lacked sufficient allegations, the proper course was to reverse the "with prejudice" dismissal and allow amendment on remand.

## CONCLUSION

For all these reasons, the Court should grant the petition.

Respectfully submitted,

Dated: September 15, 2025          By: */s/Jeremiah Galus*

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@adflegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@adflegal.org

James A. Campbell
Jeremiah Galus
Ryan J. Tucker
Mark Lippelmann
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jcampbell@adflegal.org
jgalus@adflegal.org
rtucker@adflegal.org
mlippelmann@adflegal.org

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

I certify that this petition for rehearing en banc complies with Circuit Rule 40-1 because it contains 4,196 words, excluding the parts exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

I also certify that this petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook.

*/s/Jeremiah Galus*
Jeremiah Galus
Counsel for Appellant

September 15, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2025, I electronically filed the foregoing petition for rehearing en banc with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Jeremiah Galus*
Jeremiah Galus
Counsel for Appellant

## ADDENDUM

### Recent Cases Asserting Church-Autonomy Claims

1.      *Etienne v. Ferguson*, No. 3:25-cv-05461-DGE, 2025 WL 2022101 (W.D. Wash. July 18, 2025) (alleging that a state law violates church autonomy by requiring churches to disclose priest-penitent communications).

2.      *Orthodox Church in Am. v. Ferguson*, No. 2:25-cv-01537 (W.D. Wash. filed June 16, 2025) (same).

3.      *Camp Id-Ra-Ha-Je Assoc. v. Roy*, No. 1:25-cv-01484-NRN (D. Colo. filed May 12, 2025) (alleging that a regulation that required summer camps to allow children to use restrooms and other facilities based on gender identity rather than biological sex violated Christian camp's religious autonomy).

4.      *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50 (9th Cir. 2024) (challenging state law that interferes with religious hiring practices).

5.      *Union Gospel Mission of Yakima Wash. v. Ferguson*, No. 23-2606, 2024 WL 3755954 (9th Cir. Aug. 12, 2024) (same).

6.      *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826 (6th Cir. 2024) (same).

7.      *Gracehaven, Inc. v. Montgomery Cnty. Dep't of Job & Fam. Servs.*, No. 3:24-cv-325-MJN-CHG (S.D. Ohio filed Dec. 9, 2024) (challenging a county's decision to not renew a contract with a Christian

nonprofit solely because the ministry hired its employees based on religion).

8.    *Gen. Conf. of Seventh-day Adventists v. Horton*, No. 8:24-cv-02866-TDC, 2025 WL 1703806 (D. Md. filed Oct. 2, 2024) (challenging state law that interferes with religious hiring practices).

9.    *Cath. Benefits Ass'n v. Burrows*, No. 1:24-cv-00142-DMT-CRH (D.N.D. filed July 24, 2024) (challenging EEOC rule that would require Catholic employers to accommodate employees seeking abortion).

10.   *Gordon Coll. v. U.S. Small Bus. Admin.*, No. 23-614 (BAH), 2024 WL 3471261, at *14 (D.D.C. July 18, 2024) (addressing merits of religious college's claim that federal funding condition violated its religious autonomy).

11.   *Fellowship of Christian Athletes v. District of Columbia*, 743 F. Supp. 3d 73, 82–83 (D.D.C. July 11, 2024) (challenging a public school's mandate that a Christian student group allow students who rejected Christian beliefs to lead the group because it violated religious autonomy).

12.   *U.S. Conf. of Cath. Bishops v. EEOC*, No. 2:24-cv-00691-DCJ-TPL (W.D. La. filed May 22, 2024) (challenging EEOC rule that would require Catholic employers to accommodate employees seeking abortion).

13.    *Church of the Rock, Inc. v. Town of Castle Rock*, No. 1:24-cv-01340-DDD-KAS, 2024 WL 5715593 (D. Colo. filed May 13, 2024) (claiming that the application of zoning laws, which prevented a church from running a temporary homeless shelter, violated church autonomy).

14.    *Dad's Place of Bryan Ohio v. City of Bryan*, No. 3:24-cv-00122-JZ (N.D. Ohio filed Jan. 22, 2024) (same).

15.    *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1184 (D. Colo. 2023) (finding that application of a state's non-discrimination policy to a religious school's hiring policies likely violated church autonomy).

16.    *St. Dominic Acad. v. Makin*, No. 2:23-cv-00246-JAW (D. Me. filed June 13, 2023) (alleging that the conditioning of state funds on religious schools agreeing to follow certain nondiscrimination provisions violated the schools' religious autonomy).

17.    *Loe v. Jett*, No. 23-cv-1527-NEB-JFD (D. Minn. filed May 24, 2023) (alleging that state funding condition that prohibited religious schools from hiring based on religion violated schools' religious autonomy).

18.    *Crosspoint Church v. Makin*, No. 1:23-cv-00146-JAW (D. Me. filed Mar. 27, 2023) (alleging that the conditioning of state funds on religious schools agreeing to follow certain nondiscrimination provisions violated the schools' religious autonomy).

19.    *Spencer v. Nigrelli*, 648 F. Supp. 3d 451, 464–66 (W.D.N.Y. 2022) (enjoining a state law forbidding firearms in churches because, among other reasons, it violated church autonomy), *aff'd sub nom. Antonyuk v. Chiumento*, 89 F.4th 271, 346, 352 (2d Cir. 2023) (affirming on free exercise grounds without addressing church autonomy), *vacated and remanded sub nom. Antonyuk v. James*, 144 S. Ct. 2709 (July 2, 2024), *remanded to* 120 F.4th 941, 955 n.3 (2d Cir. 2024) (stating that the panel opinion and mandate were reinstated as to Spencer).

20.    *Sacred Heart of Jesus Parish v. Nessel*, No. 1:22-cv-1214-JMB-PJG (W.D. Mich. filed Dec. 22, 2022) (challenging state law that interferes with religious hiring practices).

21.    *Sisters of Life v. Bassett*, No. 1:22-cv-07529 (S.D.N.Y. filed Sept. 2, 2022) (alleging that a state law, which allowed the state to review pregnancy centers' internal documents, infringed on church autonomy).

22.    *Commonwealth v. Beshear*, 981 F.3d 505, 510 (6th Cir. 2020) (challenging COVID-19 restrictions).

23.    *Danville Christian Acad., Inc. v. Beshear*, 503 F. Supp. 3d 516, 525 n.4 (E.D. Ky. 2020) (considering religious school's claim that COVID-19 restrictions violated its religious autonomy as "part and parcel" of school's free-exercise argument).

24.    *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, No. 5:20-cv-2798 (N.D. Cal. filed May 19, 2020) (claiming that a

public school's refusal to approve a Christian student group because it wouldn't give up its religious leadership requirement violated the group's religious autonomy).

    25.   *Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler*, No. 3:19-cv-05181 (W.D. Wash. Mar. 8, 2019) (alleging that state's abortion-coverage requirement violated church's religious autonomy).

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| YOUTH 71FIVE MINISTRIES, | No. 24-4101 |
| *Plaintiff - Appellant*, | D.C. No. 1:24-cv-00399-CL |
| v. | |
| CHARLENE WILLIAMS, Director of the Oregon Department of Education, in her individual and official capacities; BRIAN DETMAN, Director of the Youth Development Division, in his individual and official capacities; CORD BUEKER, Jr., Deputy Director of the Youth Development Division, in his individual and official capacities, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the District of Oregon
Mark D. Clarke, Magistrate Judge, Presiding

Argued and Submitted November 20, 2024
Pasadena, California

Filed August 18, 2025

Before: Johnnie B. Rawlinson, Morgan B. Christen, and
Anthony D. Johnstone, Circuit Judges.

Opinion by Judge Johnstone;
Concurrence by Judge Rawlinson

## **SUMMARY**[*]

### **First Amendment**

In a suit brought by Youth 71Five Ministries alleging
that the Oregon Department of Education, through its Youth
Development Division, violated 71Five's First Amendment
rights when the Division withdrew its conditional award of
a grant to 71Five, the panel affirmed in part and reversed in
part the district court's denial of 71Five's request for a
preliminary injunction and its dismissal of 71Five's claims
based on qualified immunity.

The Division added a new grant eligibility Rule that
prohibits grantees from discriminating based on religion,
and withdrew 71Five's conditional grant award after
discovering that 71Five imposes religious requirements on
all employees and volunteers.

The panel affirmed the district court's decision not to
enjoin the Division's enforcement of the Rule as to 71Five's
grant-funded initiatives. 71Five was unlikely to succeed on
the merits of its claim that the Rule violates the First

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

Amendment right to the free exercise of religion because the Rule is neutral and generally applicable, and likely satisfies rational-basis review. Nor was 71Five likely to succeed on the merits of its novel religious autonomy claims that conditioning grant funding on compliance with the Rule impermissibly interferes with its choice of ministers and faith-based hiring of non-ministers.

Addressing 71Five's claim that the Rule abridges its expressive association by requiring it to accept employees and volunteers who disagree with its message, the panel held that the Rule was likely permissible as a reasonable and viewpoint-neutral regulation as to Division-funded initiatives. But to the extent that Rule restricts 71Five's selection of speakers to spread its Christian message through initiatives that receive no Division funding, the Rule likely imposes an unconstitutional condition. Accordingly, the panel directed the district court to enter an order enjoining enforcement of the Rule as to initiatives that do not receive grant funding from the Division.

The panel affirmed the district court's dismissal of 71Five's claims for damages because 71Five did not allege any violation of a clearly established right, and therefore defendants were entitled to qualified immunity. However, the panel reversed the district court's dismissal of 71Five's claims for declaratory and injunctive relief, against which qualified immunity does not protect.

Judge Rawlinson concurred in the judgment only because of this court's truncated review of a district court's decision granting or denying injunctive relief, and obligatory deference to a district court's discretionary decision to decline consideration of the arguments and evidence presented in a Reply Brief. Otherwise, she would conclude

that the State of Oregon's application of the rules governing its grant program violated 71Five's right to the free exercise of religion.

---

## COUNSEL

Jeremiah Galus (argued), James A. Campbell, Mark Lippelmann, and Ryan J. Tucker, Alliance Defending Freedom, Scottsdale, Arizona; David A. Cortman, Alliance Defending Freedom, Lawrenceville, Georgia; John J. Bursch, Alliance Defending Freedom, Washington, D.C.; for Plaintiff-Appellant.

Kirsten M. Naito (argued), Assistant Attorney General; Benjamin Gutman, Solicitor General; Ellen F. Rosenblum, Attorney General; Oregon Department of Justice, Salem, Oregon; for Defendants-Appellees.

# OPINION

JOHNSTONE, Circuit Judge:

Oregon's Department of Education, through its Youth Development Division, runs a Youth Community Investment Grant Program. The Program funds community organizations that serve at-risk youth in furtherance of the Division's statutory goals to support educational success, prevent crime, and reduce high-risk behaviors. The Division awards grants through a competitive application process that requires applicants to certify compliance with the Division's policies. To ensure that its grants benefit Oregonians of all backgrounds, the Division implemented a new policy for the 2023–2025 grant cycle requiring applicants to certify that they "do[] not discriminate . . . with regard to," among other protected characteristics, religion.

Since 2017, Youth 71Five Ministries ("71Five") has received funding from the Division for several of its initiatives. While it serves all youth who choose to participate, 71Five's "primary purpose" is "to teach and share about the life of Jesus Christ." To that end, 71Five requires that its board members, employees, and volunteers agree to a Christian Statement of Faith and be involved in a local church. Because 71Five's hiring practices violate the Division's antidiscrimination policy, the Division withdrew its conditional award of a grant for 2023–2025. 71Five sued for equitable and monetary relief and sought a preliminary injunction. It claims that the Division's enforcement of the antidiscrimination policy violates its free-exercise, religious-autonomy, and expressive-association rights under the First Amendment. The district court declined to grant the preliminary injunction and dismissed 71Five's claims based

on qualified immunity. We affirm in part, reverse in part, and remand.

Though 71Five advances several claims, most of them boil down to an argument that the Division treats it worse than secular grantees because of its religious exercise or message. If that is true, then the Division almost certainly violates the First Amendment. But the district court did not abuse its discretion in determining that—on the current record—71Five has yet to show any such discrimination. We therefore affirm the district court's decision not to enjoin the Division's enforcement of its policy as to 71Five's grant-funded initiatives. Even absent discrimination, however, the Constitution does not permit the Division to leverage its grants to restrict 71Five's expression in initiatives that receive no public funds. To the extent that the Division's nondiscrimination policy applies beyond 71Five's grant-funded initiatives, the policy likely violates 71Five's right of expressive association. At this early stage, 71Five is entitled to a preliminary injunction on that basis, and it can continue to pursue final declaratory and injunctive relief for all its claims. But because 71Five does not allege a violation of any "clearly established" right, qualified immunity bars its claims for damages.

## I. 71Five challenges the Division's religious non-discrimination Rule.

Oregon's Department of Education created its Youth Development Division "to invest in communities to ensure equitable and effective services for youth." As part of that mission, the Division administers the Youth Community Investment Grant Program, which funds community-based initiatives serving youth at risk of disengaging from school or work. The Program serves the Division's statutory goal of

"[p]rovid[ing] services to children and youth in a manner that supports educational success, focuses on crime prevention, reduces high risk behaviors," and generally "improve[s] outcomes for youth[.]" To ensure that its grants benefit communities across Oregon, the Division funds grantees that work in different regions, provide a wide array of services, and offer "culturally responsive" programs tailored to the "perceptions and behaviors unique to [the] specific culture" of various groups.

The Division awards grants through a competitive application process, which requires applicants to certify that they meet certain eligibility requirements. For the 2023–2025 cycle, the Division added a new eligibility Rule requiring every grant applicant to certify that it "does not discriminate in its employment practices, vendor selection, subcontracting, or service delivery with regard to race, ethnicity, religion, age, political affiliation, gender, disability, sexual orientation, national origin or citizenship status." The Division added the Rule to align with other state agencies' practices and to further its "commitment to equitable access, equal opportunity, and inclusion."

Youth 71Five Ministries is a nonprofit Christian ministry that "exists to share God's Story of Hope with young people." 71Five fulfills this mission by offering youth-oriented programs that "provide social interaction, vocational training, and meaningful relationships, all while emphasizing the importance of having a relationship with Jesus Christ." The ministry's services include youth centers, apprenticeship and career programs, camps, conflict-resolution workshops, and mentoring. While these various services "strive to meet participants' physical, mental, emotional, and social needs," 71Five's "primary purpose" is "to teach and share about the life of Jesus Christ."

71Five does not discriminate in its vendor selection, subcontracting, or service delivery. But because it "depends on its staff and volunteers to fulfill the ministry's distinctly Christian mission and purpose," by "articulat[ing] and advanc[ing] its Christian messages," 71Five "requires all board members, employees and volunteers 'to be authentic followers of Christ.'" Officers, staff, and volunteers must "subscribe and adhere" to a "Statement of Faith" reflecting "the beliefs of historic Christianity" and "must also be actively involved in a local church." And although it serves students and families regardless of their religion, 71Five "encourage[s] [them] to be involved in a local church too."

From 2017 to 2023, the Division awarded seven grants to 71Five. In 2023, after the Division implemented the Rule, 71Five again applied for grants to fund its youth centers and "Break the Cycle," a mountain-biking initiative that serves youth in juvenile correction facilities. Though it discriminates in employment based on religion, 71Five certified in its applications that it complied with the Rule because it believed its religious hiring practices were constitutionally exempt. In July 2023, the Division conditionally awarded 71Five grants totaling $410,000.

Four months later, the Division received an anonymous report that, according to its website, 71Five discriminates in hiring on the basis of religion. In response, the Division reviewed 71Five's website and discovered that 71Five imposes religious requirements on all employees and volunteers. The Division then wrote to 71Five to confirm what its website suggested: that 71Five discriminates based on religion in apparent violation of the Rule. 71Five's executive director confirmed that the ministry requires applicants for staff and volunteer positions to affirm its Statement of Faith and expects them to be affiliated with a

local church. As a result, the Division withdrew the conditional awards.

71Five sued several state officials under 42 U.S.C. § 1983. 71Five claimed that the Defendants' enforcement of the Rule violates its First Amendment rights to the free exercise of religion, religious autonomy, and expressive association. 71Five sought declaratory and injunctive relief against the Defendants in their official capacities, as well as damages from the Defendants in their individual capacities.

71Five also moved for a preliminary injunction to reinstate its conditionally awarded grants and to enjoin the Division from refusing to award future grants based on 71Five's religious hiring practices. The Defendants opposed the motion and moved to dismiss 71Five's claims for damages based on qualified immunity. In its reply brief in support of the motion for a preliminary injunction, 71Five argued—for the first time and based on new factual assertions—that the Division allows secular grantees to violate the Rule by "openly discriminat[ing] in the provision of services based on race, ethnicity, gender, and national origin[.]"

The district court denied the preliminary injunction because it found that 71Five was unlikely to succeed on the merits, any past monetary harm would be reparable without an injunction, and neither the balance of equities nor public interest favored an injunction. For the same reasons it deemed 71Five unlikely to succeed on the merits, the district court determined that the Defendants were entitled to qualified immunity. Though the Defendants moved to dismiss only the damages claims, the district court dismissed all claims with prejudice. After 71Five timely appealed, a

motions panel of this Court granted an emergency injunction
and set the case for argument on an expedited basis.

We have jurisdiction to review the denial of a
preliminary injunction under 28 U.S.C. § 1292(a)(1), and we
review such decisions for abuse of discretion. *Fellowship of
Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*
("*FCA*"), 82 F.4th 664, 680 (9th Cir. 2023) (en banc). "A
district court abuses its discretion when it utilizes 'an
erroneous legal standard or clearly erroneous finding of
fact.'" *Id.* (quoting *All. for the Wild Rockies v. Cottrell*, 632
F.3d 1127, 1131 (9th Cir. 2011)).

## II. The district court abused its discretion only in declining to enjoin the Rule's application beyond Division-funded initiatives.

71Five seeks a preliminary injunction on the grounds
that the Division's enforcement of the Rule violates its
religious and expressive freedoms under the First
Amendment. To obtain a preliminary injunction, 71Five
must establish that (1) it "is likely to succeed on the merits,"
(2) it "is likely to suffer irreparable harm in the absence of
preliminary relief," (3) "the balance of equities tips in [its]
favor," and (4) "an injunction is in the public interest."
*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).
"Where, as here, the party opposing injunctive relief is a
government entity, the third and fourth factors—the balance
of equities and the public interest—'merge.'" *FCA*, 82 F.4th
at 695 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Likelihood of success is the most important factor in the
analysis, particularly where a plaintiff alleges a
constitutional violation. *Meinecke v. City of Seattle*, 99 F.4th
514, 521 (9th Cir. 2024). And here, it is the only factor we
need to consider at any length because the other three factors

favor an injunction. First, if 71Five shows that it is likely to succeed on the merits, it has "demonstrate[d] the existence of a colorable First Amendment claim" and established the requisite irreparable injury. *See FCA*, 82 F.4th at 694–95 (quoting *Cal. Chamber of Com. v. Council for Educ. & Rsch. On Toxics*, 29 F.4th 468, 482 (9th Cir. 2022)). Similarly, if "we find that [the Rule] offends the First Amendment, . . . the balance of hardships favors" 71Five. *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 749 (9th Cir. 2012); *but cf. Dep't of Educ. v. California*, 145 S. Ct. 966, 968–69 (2025) (noting that the government's inability to recover grant funds after they are disbursed weighs against compelling immediate disbursement). And "it is always in the public interest to prevent the violation of a party's constitutional rights." *FCA*, 82 F.4th at 695 (quoting *Am. Beverage Ass'n v. City of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019)).

One last note on the applicable standard: we have so far assumed that 71Five must show only that it is *likely* to succeed on the merits. This standard applies to prohibitory injunctions, which aim to preserve the status quo by preventing a party from taking action. *FCA*, 82 F.4th at 684 (quoting *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014)). The Defendants argue, and the district court concluded, that the standard for mandatory injunctions applies. A mandatory injunction alters the status quo by requiring a party to take action and thus "place[s] a higher burden on the plaintiff to show 'the facts and law *clearly* favor the moving party.'" *Id.* (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)). But we determine the status quo based on "the legally relevant relationship between the parties before the controversy arose," that is, before the action challenged in the complaint occurred. *Ariz.*

*Dream*, 757 F.3d at 1061 (emphasis omitted). Here, the challenged action is the Division's enforcement of the Rule against 71Five; before that, 71Five had a conditional grant award and was eligible for future Division funding. "Because it was the [Division]'s action that 'affirmatively changed' that status quo and [71Five's] motion for a preliminary injunction seeks to restore that status quo, the relief sought is properly viewed as a prohibitory injunction." *FCA*, 82 F.4th at 685. We therefore disagree with the district court and decline the Defendants' request to apply the heightened standard for mandatory injunctions.

We turn to 71Five's likelihood of success on the merits of its First Amendment claims. The district court did not abuse its discretion in concluding that 71Five is unlikely to succeed on its free-exercise and religious-autonomy claims, and the Rule's application to Division-funded initiatives is likely a permissible burden on 71Five's expressive association. But applying the Rule to initiatives that receive no grant funding likely violates 71Five's right of expressive association. Denying a preliminary injunction as to those initiatives was an abuse of discretion.

### A. The Rule likely does not prohibit the free exercise of religion.

The Free Exercise Clause of the First Amendment, applicable to the states under the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I; U.S. Const. amend XIV. But not all laws that burden religious exercise presumptively violate this mandate. "[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of*

*Philadelphia*, 593 U.S. 522, 533 (2021) (citing *Emp. Div., Dep't. of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878–82 (1990)). The Defendants do not dispute that the Rule burdens 71Five's religious exercise, so our analysis turns on whether the Rule is both neutral and generally applicable. Although 71Five claims that the Rule is neither, the district court did not abuse its discretion in determining that the Rule is both.

### 1. The Rule is likely neutral.

"[I]f it is to respect the Constitution's guarantee of free exercise," the Division "cannot impose regulations that are hostile to . . . religious beliefs" or engage in "even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 638 (2018) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993)). We may infer hostility from "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *FCA*, 82 F.4th at 690 (quoting *Masterpiece Cakeshop*, 584 U.S. at 639).

71Five does not contend that any historical background or events leading to the Division's adoption of the Rule show hostility to religion. Nor does 71Five contend that Division officials made any statements of the kind courts have found to show hostility to religion. *See FCA*, 82 F.4th at 692; *Masterpiece Cakeshop*, 584 U.S. at 634–36; *Lukumi*, 508 U.S. at 541–42. Instead, 71Five's motion argued that the Division's hostility toward religion was reflected in its "target[ed]" enforcement of the Rule against 71Five while excepting secular groups, which operated to "single out the

ministry's religious beliefs and practices." But as we discuss below, the district court did not clearly err in finding that the Division did not and could not grant such exceptions. 71Five also asserts that the Division "went out of its way to scrutinize 71Five's website" without inspecting secular organizations' websites, showing animus toward religion. Yet 71Five admits that the Division first reviewed 71Five's website based on an anonymous complaint. And the record contains no evidence that the Division received similar complaints about any secular grantee.

71Five next argues that the Rule is hostile toward religion because "disqualifying otherwise eligible recipients from a public benefit 'solely because of their religious character' imposes 'a penalty on the free exercise of religion'" that is not neutral. *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 475 (2020) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017)). It styles this argument as a distinct claim, but we have situated this analysis within our ordinary framework for free-exercise claims under *Smith*. *See Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1166–69 (9th Cir. 2024). In *Carson ex rel. O.C. v. Makin*, the Supreme Court held that denying public funds based on an entity's religious use for those funds is no different than denying funds based on religious status because, in practice, only religious entities use funds for religious purposes. 596 U.S. 767, 787–88 (2022). So 71Five contends that, in disqualifying potential grantees who discriminate in hiring based on religion, the Rule effectively "exclude[s] otherwise eligible organizations because of their religious character and exercise."

But unlike the religious-use prohibition at issue in *Carson*, the Rule does not deny funding based on a practice exclusive to religious organizations. Government agencies,

secular corporations, and religious ministries alike might engage in religion-based employment discrimination. *See, e.g.*, *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1219–20 (9th Cir. 2023) (government); *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 770–71 (2015) (private retailer). So the Rule does not discriminate based on religious status or exercise; it merely disqualifies a class of potential grantees—those who discriminate based on religion—that includes both secular and religious organizations.

Nor does the Rule "grant[] a denominational preference by explicitly differentiating *between* religions based on theological practices." *Catholic Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm.*, 605 U.S. 238, 250 (2025) (emphasis added). 71Five contends that the Rule does so because it permits the Division to fund religious grantees whose beliefs, unlike 71Five's, do not require them to hire only co-religionists. While that may be the Rule's result, it is not due to any "explicit [or] deliberate distinctions between different religious organizations" that would render the Rule presumptively unconstitutional. *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982). Rather, it is the indirect consequence of the Rule's general prohibition on religious exclusion by all grantees, whether faith-based or not. Such "'secular criteria' that 'happen to have a 'disparate impact' upon different religious organizations" do not contravene the First Amendment's mandate of denominational neutrality. *Catholic Charities*, 605 U.S. at 250 (quoting *Larson*, 456 U.S. at 246 n.23). The Rule is therefore neutral as to religion.

### 2. *The Rule is likely generally applicable.*

A policy is not generally applicable if the government can or does apply it in a way that disfavors religious activity.

*FCA*, 82 F.4th at 686. So the policy may not have any discretionary "mechanism for individualized exemptions" that "invites the government to consider the particular reasons for a person's conduct." *Id.* at 687 (quoting *Fulton*, 593 U.S. at 533). And "the government may not 'treat . . . comparable secular activity more favorably than religious exercise.'" *Id.* at 686 (omission in original) (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)). The district court did not abuse its discretion in determining that the Rule likely satisfies both requirements.

> a. The Rule does not provide for individualized exemptions.

71Five has not shown that the Rule contains any "mechanism for individualized exemptions" that gives the Division discretion to discriminate against religious conduct. *Fulton*, 593 U.S. at 533 (citation omitted). Under the Rule, an "Applicant must complete all . . . Certification information." That language is mandatory, leaving the Division no room to make exceptions. 71Five recognizes as much, conceding that a "failure to check the box" confirming compliance with the Rule "would have caused 71Five's [grant] application . . . [not] to be considered."

Unable to show that the Rule itself contains a mechanism for exemptions, 71Five points to a separate policy providing that "[i]t may be possible" for grant recipients "to negotiate some provisions of the final Grant," including the scope of work to be funded. 71Five argues that, under this separate policy, the Division may waive grantees' compliance with the Rule. But on its face, that policy allows the Division only to negotiate the terms of its agreements with applicants who have already satisfied baseline eligibility requirements like the Rule. And the Division's director confirmed that those

eligibility requirements cannot be waived or negotiated. In any case, the policy notes that "many provisions cannot be changed," and 71Five offers no evidence that the Rule is among the negotiable provisions. The district court thus did not clearly err in finding that the Rule has no mechanism for individualized exemptions.

> b. The Division likely treats comparable religious and secular activity the same.

It was also within the district court's discretion to find that, in enforcing the Rule, the Division does not treat 71Five's religious exercise less favorably than comparable secular activity. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the [policy] at issue." *Tandon*, 593 U.S. at 62 (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17–18 (2020) (per curiam)). The Division's interest is its "commitment to equitable access, equal opportunity, and inclusion" in the programs it funds. Neither 71Five's complaint nor its motion for a preliminary injunction identified any secular activity funded by the Division that undermines the Division's commitment to equity and inclusion like 71Five's religious hiring practices do. Instead, 71Five's motion argued that the Rule triggers strict scrutiny under the Free Exercise Clause only for the reasons we have already rejected: that the Rule is not generally applicable due to a "[s]ystem of [i]ndividualized [e]xemptions" and is not neutral because it "[t]argeted" 71Five's religious beliefs. So the district court concluded that the Division does not favor comparable secular activity over 71Five's religious exercise.

71Five asks us to reverse based on a new argument and new factual assertions in its reply brief in district court in

support of the motion for a preliminary injunction. There, for the first time, 71Five attached screenshots of several secular grantees' websites, which state that the grantees: "serve African and African American families" through programs "designed to . . . empower[] Black students"; "serve & work with . . . Latin/e/o/a/x, immigrant, Indigena, [and] Afrodescendiente" communities; "create equitable opportunities for African refugees and immigrant[s]"; "focus on the needs of . . . immigrant Latine women"; and are "committed to providing a pro-girl and girl-centered environment" through "programming . . . designed for those who identify as girls," are "exploring their gender identity," or "are gender non-conforming." The website of one grantee featured a page addressing common questions, including "Why not boys?"

Based on these screenshots, 71Five raised a new argument that the Division allows secular grantees to categorically deny services to particular demographic groups. The reply brief further argued, again for the first time, that the secular grantees' alleged discrimination in service provision is akin to 71Five's admitted discrimination in hiring, as both violate the Rule. Because, the reply brief contended, the Division has not revoked funding from these secular grantees, it treats comparable secular activity more favorably than 71Five's religious exercise.

71Five faults the district court for rejecting its belated argument based on the court's concerns about "depriving Defendants of notice and an opportunity to respond." But a "district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). So it did not abuse its discretion by declining to do so. And now, on appeal, 71Five asks us to consider more screenshots of secular grantees' websites that

were not included even in its reply brief to the district court. We decline to consider this evidence in the first instance. *See* Fed. R. App. P. 10(a)(1); *Martinez v. Newsom*, 46 F.4th 965, 975 (9th Cir. 2022). Based on the evidence properly before the district court, it was not an abuse of discretion to conclude that the Division likely treats comparable secular and religious activity the same.

> c. Considering the arguments and assertions in 71Five's reply brief to the district court would not change the outcome.

In any event, considering the new argument and assertions in 71Five's reply brief to the district court would not alter our highly deferential review of the district court's finding that secular grantees comply with the Rule. 71Five's argument turns on inferences drawn from the statements on secular grantees' websites that they "serve," "work with," "focus on the needs of," "create . . . opportunities for," and offer "programming . . . designed for" particular demographic groups. In 71Five's view, such statements must mean that the secular grantees deny services to anyone not in the specified demographic groups. If so, 71Five contends, the secular grantees violate the Rule just like 71Five, so the Division must either treat them the same or satisfy strict scrutiny. *FCA*, 82 F.4th at 686. Were this evidence properly before us, the Concurrence would reach the same conclusion based on the same premise. Yet the district court did not read the secular grantees' websites that way. It explained that "even if the facts alleged in [71Five]'s Reply were properly at issue . . . , none of the allegations" suggest that the secular grantees violate the Rule. The district court instead found the statements on the secular grantees' websites to show only that the grantees "direct[] . . . services to particular

demographics in the community," without refusing service
to others "who fall outside the target demographics."

The Concurrence, with 71Five, sees these findings as
"mistaken." But on abuse-of-discretion review we do not
"automatically *reverse* a district court's factual finding if we
decide a 'mistake has been committed.'" *United States v.
Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).
Instead, we can reverse a district court's factual finding only
for clear error—that is, only if it was "illogical, implausible,
or without support in inferences that may be drawn from the
facts in the record." *FCA,* 82 F.4th at 680 (quoting *M.R. v.
Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012)). That is not the
case here. Unlike 71Five's publicly posted hiring policy,
none of the secular grantees' websites expressly state that
they serve *only* their target demographics or refuse to serve
individuals outside those groups. Even the statement that
comes closest—"Why not boys?"—is ambiguous. It is
possible to read that statement, as 71Five does, to mean that
the grantee does not serve boys. Or the statement could mean
that the grantee does not focus on boys but still allows them
to access the organization's girl-centered programming. For
example, the grantee's website also explained that "each
gender engages . . . differently" with "issues while growing
up," so the grantee aims to "help youth who have
experienced girlhood" but "understand[s] that to help girls,
all genders . . . must be part of the conversation." While we
may draw different inferences from this limited information,
and the district court may make different findings with a
fuller record on remand, its findings are logically coherent,
plausible, and supported by the record as it now stands.

Our decision in *Fellowship of Christian Athletes* is not to
the contrary. *See* 82 F.4th at 687–90. There, a school district
revoked its recognition of a Christian student club because

the club required its student leaders to affirm a statement of faith, which violated the district's nondiscrimination policy. *FCA*, 82 F.4th at 672–75. Sitting en banc, we reversed the district court's denial of a preliminary injunction, holding that the school district had likely violated the Free Exercise Clause because its enforcement of the policy was neither neutral nor generally applicable. *Id.* at 695–96. Our analysis turned, in large part, on our determination that the school district continued to recognize secular clubs with discriminatory membership policies. *Id.* at 687–90.

Unlike in this case, though, the record before our en banc court included some evidence that we interpreted as showing that secular clubs expressly excluded individuals based on protected characteristics. *See, e.g.*, *id.* at 689 (noting statement on club application form that a "student shall no longer be considered a member if the student . . . does not identify as female" (omission in original)). We also pointed to a school district official's statement that we took as an acknowledgment that other groups could limit their membership with impunity. *Id.* at 678. Here, the district court found that the secular grantees did not categorically exclude based on protected characteristics, and there is no evidence in the record clearly establishing that they do. Quite the opposite: every secular grantee has certified that it does *not* discriminate, as is required to receive funding.

Recognizing that even its reply-brief attachments do not conclusively show that secular grantees deny service based on protected characteristics, 71Five argues that merely tailoring services to a target demographic is comparable to 71Five's categorical exclusion of non-Christians. We disagree. The sole basis for that argument is *FCA*'s holding that a South Asian Heritage club's policy "'prioritiz[ing]' acceptance of south Asian students" was likely comparable

to a Christian club's denial of leadership positions to all non-Christians. *Id.* at 678, 688. But in *FCA*, we read that policy prioritizing "acceptance" of members from a particular ethnic group not just to inform program design, but also to "limit . . . membership" based on ethnicity. *Id.* at 678. Thus, *FCA* held that secular and religious organizations' exclusions are comparable when they both restrict who gets in the door. Yet, as the district court found, 71Five did not conclusively show that the secular grantees exclude anyone. And *FCA* does not suggest that tailoring services to meet the needs of a particular demographic, while allowing everyone to access those services, is somehow comparable to shutting out an entire protected class. 71Five offers no other explanation to support that proposition. *See Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1176–77 (9th Cir. 2021) (noting that a free-exercise plaintiff seeking a preliminary injunction bears the burden of establishing a likelihood that the challenged policy is not generally applicable).

Nor does the record reflect that the Division ever treats service-tailoring as contrary to its interests, let alone a violation of the Rule. That makes sense: the Program aims to fund initiatives that are accessible to as many Oregonians as possible. The Division allows grantees to accommodate "perceptions and behaviors unique to a specific culture" to ensure that many different communities can receive services that suit their particular needs. For example, the Division took no issue with 71Five's tailoring of its services to promote uniquely Christian values—those projects likely serve people of faith who would not access less "culturally responsive" secular resources. And the Division continues to fund other faith-based groups. It revoked funding only after learning that 71Five denies employment and volunteer

opportunities to non-Christians, which limits the number of Oregonians who can be involved in Division-funded initiatives. Service-tailoring does not similarly threaten the Division's interests, so allowing it does not favor comparable secular activity over 71Five's religious exercise.

> d. On this record, we affirm the district court's preliminary conclusion that the Rule is likely generally applicable.

At this early stage, the district court did not abuse its discretion in concluding that the Rule is generally applicable. To be clear, we do not foreclose the possibility that 71Five may prove on remand that some secular grantees refuse to serve individuals outside their target demographics. In that case, the Division's continued funding of those secular grantees could reveal that it has discretion to grant exemptions from the Rule. *See Fulton*, 593 U.S. at 533. And if 71Five shows that such refusals of service are comparable to its own exclusionary hiring practices, that would doubly trigger strict scrutiny, as the Division would be favoring comparable secular activity over religious exercise. *FCA*, 82 F.4th at 686. As is often the case "at a very preliminary stage of the proceedings, . . . [f]urther development of the record . . . as this case progresses," such as the timely presentation of screenshots of secular grantees' websites, "may alter [the district court's] conclusions." *In re Creech*, 119 F.4th 1114, 1119 (9th Cir. 2024) (alteration in original; citation omitted); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[T]he findings of fact and conclusions of law made by a court [deciding] a preliminary injunction are not binding at trial on the merits."). But under our deferential standard of review, the district court did not abuse its discretion in refusing to consider 71Five's new arguments and evidence in its reply brief. Nor did it clearly

err in finding, in the alternative, that 71Five has thus far not shown categorical exclusion by the secular grantees. So we must affirm the district court's preliminary conclusion.

### 3. *The Rule likely satisfies rational-basis review.*

Because the Rule is neutral and generally applicable, it is subject only to rational-basis review. *Tingley v. Ferguson*, 47 F.4th 1055, 1084 (9th Cir. 2022). "States carry a 'light burden' under this review"—a "law is 'presumed to be valid and will be sustained' . . . if it is 'rationally related to a legitimate state interest.'" *Id.* at 1077–78 (quoting *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 457 (9th Cir. 2018)). The Division adopted the Rule to, among other reasons, better reflect its "commitment to equitable access, equal opportunity, and inclusion." That is a legitimate interest. *Cf. Doe v. Horne*, 115 F.4th 1083, 1112 (9th Cir. 2024) (explaining that "[s]tates have important interests in inclusion, nondiscrimination, . . . [and] ensuring equal athletic opportunities"); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984). The Rule rationally furthers that interest by ensuring that Division-funded initiatives are equally open to employees, volunteers, and participants regardless of race, sex, religion, or any other protected characteristic. The district court therefore did not abuse its discretion in determining that 71Five is not likely to succeed on the merits of its free-exercise claim.

## B. The district court did not abuse its discretion in concluding that 71Five's religious-autonomy claims are unlikely to succeed.

In addition to guaranteeing the free exercise of religion, the First Amendment prohibits laws "respecting an establishment of religion[.]" U.S. Const. amend. I. Together,

"the Religion Clauses protect the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012)). That broad principle of religious autonomy has given rise to two related doctrines. *See id.* at 747. First, ecclesiastical abstention "limit[s] the role of civil courts in the resolution of religious controversies that incidentally affect civil rights." *Puri v. Khalsa*, 844 F.3d 1152, 1162 (9th Cir. 2017) (quoting *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 710 (1976)). Second, the ministerial exception "precludes application of [certain] legislation to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor*, 565 U.S. at 188. 71Five argues that these doctrines prevent the Division from conditioning grant funding on compliance with the Rule, as doing so impermissibly interferes with 71Five's choice of ministers and faith-based hiring of non-ministers.

The district court declined to address the merits of 71Five's argument. Instead it determined that 71Five is unlikely to succeed because ecclesiastical abstention and the ministerial exception are "affirmative defense[s] against suit" and not "standalone right[s] that can be wielded against a state agency." Indeed, we have consistently described and applied the ministerial exception as an affirmative defense. *Puri*, 844 F.3d at 1157–58; *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 945–51 (9th Cir. 1999), *overruled on other grounds by Markel v. Union of Orthodox Jewish Congregations of Am.*, 124 F.4th 796, 810 n.6 (9th Cir. 2024). And we have explained that the ecclesiastical-abstention doctrine limits civil courts' redetermination of

inherently religious decisions. *See Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 878 n.1 (9th Cir. 1987); *Puri*, 844 F.3d at 1162–64. The Supreme Court has similarly characterized these doctrines. *See Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871) (first articulating the principle of religious autonomy as requiring "civil courts" to defer to ecclesiastical authorities on questions of "theological controversy, church discipline, [and] ecclesiastical government"); *Milivojevich*, 426 U.S. at 710–14; *Hosanna-Tabor*, 565 U.S. at 195 n.4 (recognizing the ministerial exception "as an affirmative defense to an otherwise cognizable claim"). And we are aware of no court of appeals that treats the religious-autonomy doctrines as the basis for standalone claims challenging legislative or executive action, rather than as defenses against or limits upon plaintiffs' invocation of *judicial* authority. *See, e.g.*, *O'Connell v. U.S. Conf. of Cath. Bishops*, 134 F.4th 1243, 1253–54 (D.C. Cir. 2025); *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1028–29 (10th Cir. 2022); *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 977 (7th Cir. 2021) (en banc); *McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*, 966 F.3d 346, 348 n.1 (5th Cir. 2020).

71Five has identified no opinion from the Supreme Court, this Court, or another court of appeals suggesting that plaintiffs may assert ecclesiastical abstention or the ministerial exception as § 1983 claims, nor any "historical practices [or] understandings" that would justify our recognition of these novel claims under the Religion Clauses. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535–36 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). Without more, we cannot say that the district court abused its discretion in concluding that 71Five' religious-autonomy claims are unlikely to succeed.

**C. The Rule's application beyond grant-funded activities likely violates 71Five's right of expressive association.**

The Free Speech Clause of the First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends[,]" which "plainly presupposes a freedom not to associate." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48 (2000) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622–23 (1984)). 71Five claims that the Rule abridges its expressive association by requiring it to accept employees and volunteers "who disagree" with its message "or would express a contrary view." "Even though the district court did not address this argument, we consider it in the first instance because [71Five] raised the argument before the district court." *Rosales-Martinez v. Palmer*, 753 F.3d 890, 897 n.7 (9th Cir. 2014). We hold that 71Five has established that it is likely to succeed, at least in part. As to Division-funded initiatives, the Rule is likely permissible as a reasonable and viewpoint-neutral regulation of expressive association in a limited public forum—the Grant Program. But to the extent that it restricts 71Five's selection of speakers to spread its Christian message through initiatives that receive no Division funding, the Rule likely imposes an unconstitutional condition.

### *1. The Rule likely burdens 71Five's expressive association.*

To establish that the Rule likely burdens its expressive associational right, 71Five first must show that, as a group, it "engage[s] in some form of expression." *Dale*, 530 U.S. at 648, 650 (citing *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 13 (1988)). It has done so. The ministry is

a nonprofit organization incorporated for the purely expressive purpose of "teach[ing] and shar[ing] about the life of Jesus Christ." 71Five presented evidence that it relies on employees and volunteers to fulfill that "overriding religious purpose and mission" by "communicat[ing] and introduc[ing] the Gospel of Jesus Christ to young people and their families." As its executive director explained, 71Five provides "a wide range of voluntary programs" through its employees and volunteers to "guide young people and to help them develop the spiritual, mental, physical, and social components of their lives[.]" "It seems indisputable that an association that seeks to transmit such a system of values engages in expressive activity." *Dale*, 530 U.S. at 650 (citing *Roberts*, 468 U.S. at 636 (O'Connor, J., concurring)).

Second, 71Five must show that compliance with the Rule would likely affect that expression "in a significant way." *Id.* at 648, 650 (citing *N.Y. State Club Ass'n*, 487 U.S. at 13). An organization cannot "erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Id.* at 653. Instead, the right of expressive association protects an organization's decisions to choose its messengers based only on what a person expresses. *Id.*; *see also Roberts*, 468 U.S. at 647–48. So when a law compels an organization to accept a messenger who expresses views inconsistent with the core values the organization promotes, the law may impose a cognizable burden on expressive association. *Dale*, 530 U.S. at 654; *see also Roberts*, 468 U.S. at 627–28 (1984); *N.Y. State Club Ass'n*, 487 U.S. at 13. The key inquiry for finding a burden is whether the law would "require the [organization] 'to abandon or alter'" its protected expressive activities. *N.Y. State Club Ass'n*, 487 U.S. at 13 (quoting *Bd. of Dirs. of*

*Rotary Int'l. v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987)).

71Five has established that complying with the Rule would likely alter its expression "in a significant way." *Dale*, 530 U.S. at 648. The ministry's executive director attested that 71Five selects employees and volunteers to carry out its expressive mission by "shar[ing] God's Story of Hope" with those it serves. Though 71Five imposes several religious requirements on employees and volunteers, its core demand is that they "subscribe and adhere" to a "Statement of Faith, which reflects the beliefs of historic Christianity" that 71Five hopes to spread. In essence, 71Five wants its spokespeople to affirm the very message they are tasked with communicating on its behalf. Yet the Rule likely prohibits it from doing so. In 71Five's view, the Rule thus compels it not just to use imperfect messengers, but to speak through individuals who reject its message. The Defendants have offered no evidence at the preliminary injunction stage to rebut 71Five's assertion that all its employees and volunteers contribute to its expressive mission, nor 71Five's argument that the Rule requires it to hire speakers who disavow its religious views.

The Supreme Court found a similar requirement to significantly alter an organization's expressive activity in *Dale.* There, a state antidiscrimination law required the Boy Scouts to accept as an adult leader an outspoken gay-rights activist whose public statements were "inconsistent with the values [the Boy Scouts sought] to instill in its . . . members." *Id.* at 654. Because accepting the activist as a spokesperson would have "force[d] the organization to send a message . . . that the Boy Scouts accept[ed] homosexual conduct as a legitimate form of behavior," contrary to the organization's actual views, the Court held that the law

burdened the Boy Scouts' expressive association. *Id.* at 653.
On the record before us, the Rule would likely burden
71Five's expressive association in a similar way by forcing
it to speak through individuals who reject its Statement of
Faith and thereby express their disagreement with 71Five's
message.

> ## 2. The Rule is likely a permissible regulation of 71Five's expressive association within Division-funded initiatives.

That the Rule burdens 71Five's expressive association
does not end our inquiry—we next consider whether that
burden is permissible. 71Five insists that any regulation of
expressive association is subject to strict scrutiny. But as for
all expression, the appropriate standard depends on context.
*See Sullivan v. Univ. of Wash.*, 60 F.4th 574, 580–81 (9th Cir.
2023) (analyzing the expressive association of appointees to
a public committee as the speech of public employees
"pursuant to their official duties" under *Garcetti v. Ceballos*,
547 U.S. 410 (2006)).

In *Dale*, the antidiscrimination law under challenge was
subject to heightened scrutiny because it directly regulated
the expression of organizations like the Boy Scouts,
regardless of whether those organizations received
government funding. *See* 530 U.S. at 659. That is not the
case here. Instead, the Rule affects only those who seek grant
funding from the Division. In cases challenging expressive
regulations attached to government grants, we usually must
decide whether the government is using the grants to
facilitate private expression, or whether it is merely hiring
private speakers to spread its own message. *See, e.g.*,
*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S.
819, 833–34 (1995). Where the government itself is

speaking, even through private contractors, the First Amendment affords it a freer hand to control such expression. *See id.*; *Boquist v. Courtney*, 32 F.4th 764, 779 (9th Cir. 2022). That is what the Division appears to be doing. It does not award grants simply to enable independent speech—it uses them to enlist grantees in carrying out its own statutory mandate of supporting at-risk youth in Oregon, and it selects its preferred conduits through a competitive application process. So the Rule is perhaps best analyzed as a regulation of government speech, s*ee Rosenberger*, 515 U.S. at 833 (citing *Rust v. Sullivan*, 500 U.S. 173, 194, 196–200 (1991)), or speech by government contractors, *see Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 673–81 (1996); *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1258–63 (10th Cir. 2016)*.

But the Defendants do not argue that the Rule simply shapes the Division's own speech. Instead, they argue, the Rule regulates grantees' use of public funding to facilitate the grantees' independent expression. When the government creates a forum to enable private speech, the applicable free-speech standard depends on the government's purpose for opening its doors or, in this case, its purse. *See Koala v. Khosla*, 931 F.3d 887, 900 (9th Cir. 2019). Where the government holds its resources "open for indiscriminate public use for communicative purposes," the result is a traditional or designated public forum, in which content-based restrictions on expression are subject to strict scrutiny. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993); *see also Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009). The Division's grant program does not, however, facilitate just any speech. It funds speech only by "certain groups" (*i.e.*, select

community initiatives) and only on "certain subjects" (*i.e.*, supporting youth development and reducing high-risk behaviors). *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (quoting *Pleasant Grove City*, 555 U.S. at 470). As the Defendants argue, the grant program thus looks more like a limited public forum, so "a less restrictive level of scrutiny" applies. *Id.* at 680. To pass constitutional muster, the Rule need only be "reasonable and viewpoint neutral." *Koala*, 931 F.3d at 900.

### a. Reasonableness.

For the same reasons the Rule satisfies rational-basis review, it is reasonable. The program's funding of "community-based youth development programs and services," aims to support the Division's overall mission of "invest[ing] in communities to ensure equitable and effective services for youth." In prohibiting certain forms of exclusion from grant-funded projects, the Rule rationally aligns the grant program with that mission, ensuring that the initiatives it funds are equally accessible to and can effectively serve all Oregonians. *Cf. Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 799 (9th Cir. 2011) (finding a university's policy prohibiting discrimination based on religion reasonable in light of the program's purpose "to promote diversity and nondiscrimination"), *abrogated on other grounds by FCA*, 82 F.4th 686.

### b. Viewpoint Neutrality.

The Rule is also likely viewpoint neutral. The government discriminates based on viewpoint where it "targets not merely a subject matter, 'but particular views taken by speakers on a subject.'" *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (quoting *Rosenberger*, 515 U.S. at 829).

Even where there is no intent to suppress a particular message about a topic, a law is viewpoint discriminatory if it treats speech differently "based on the specific motivating ideology or perspective of the speaker." *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 899 (9th Cir. 2018) (quoting *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1277 (9th Cir. 2017)).

Here, the Rule prohibits grantees from excluding employees, vendors, subcontractors, or clients based on their religious expression. But the Rule neither singles out any viewpoint about religion nor favors expressive associations that lack any religious perspective. That distinguishes this case from others in which restrictions on "religious activity" did not merely "exclude religion as a subject matter" but "select[ed] for disfavored treatment those [speakers] with religious . . . viewpoints." *Rosenberger*, 515 U.S. at 831. In *Lamb's Chapel*, for example, the Supreme Court held that a school district's rule was viewpoint discriminatory because it "permit[ted] school property to be used for the presentation of all views" about certain family issues "except those dealing with the subject matter from a religious standpoint." 508 U.S. 384, 393 (1993). And in *Rosenberger*, the Supreme Court held that a university discriminated based on viewpoint where it refused to fund student publications that "primarily promote[d] or manifest[ed] a particular belief in or about a deity or an ultimate reality" but funded publications expressing no view on such metaphysical topics. 515 U.S. at 831–32, 836–37. The Court explained that religion is not only "a vast area of inquiry," but also "provides . . . a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Id.* at 831. And in *Rosenberger*, "[t]he prohibited perspective, not the general subject matter,

resulted in the refusal to make . . . payments," resulting in viewpoint discrimination. *Id.*

By contrast, the Division does not deny funding to all organizations that express a religious viewpoint: it awarded grants to support 71Five's religious programming for five years and continues to fund at least four other faith-based grantees. Nor does the Division treat those organizations differently based on their religious messages. The Rule equally burdens the expressive association of grantees that seek to promote a religious perspective, an antireligious perspective, or no perspective on religion at all. An atheist organization that refuses to employ anyone who professes a belief in God is also disqualified from receiving grant funding under the Rule. And an organization that wishes not to speak about religion and excludes all who express a viewpoint on the topic, whether positive or negative, cannot receive grant funding either. For example, to avoid offending any of its clients, an organization that provides counseling to families of diverse religious backgrounds might want to prohibit its employees from commenting on the propriety or impropriety of different family structures. But the Rule would bar it from excluding employees who, for religious reasons, refused to sign a statement personally affirming that all family structures should be equally accepted.

The Rule simply disqualifies all potential grantees, regardless of viewpoint, that exclude anyone based on personal religious beliefs. It is therefore viewpoint neutral on its face, even if in practice "it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992). Of course, "a policy that is 'viewpoint neutral on its face may still be unconstitutional if not applied uniformly.'" *Waln v. Dysart*

*Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022) (quoting *Alpha Delta*, 648 F.3d at 803). But the district court did not abuse its discretion in finding that the Division has not enforced the Rule in a discriminatory manner. So the Rule is, on this record, likely viewpoint neutral as enforced. *Cf. FCA*, 82 F.4th at 711–12 (Forrest, J., concurring) (stating that a nondiscrimination policy was viewpoint discriminatory due only to its "selective application" to a religious club).

> *3. The Rule is likely an unconstitutional condition on 71Five's expressive association outside Division-funded initiatives.*

Though the Rule is likely a permissible restriction on expressive association within the limited public forum of the Program, that does not justify the separate burden it imposes on 71Five as a whole. When a policy attaches strings not only to government-funded speech, but to the speaker itself, we must further scrutinize the constitutionality of those strings. *See California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1093 (9th Cir. 2020). Even a valid condition on government funding may not "interfere with a recipient's conduct outside the scope of the [government] funded program." *Id.* at 1093 n.24 (citing *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013)).

As 71Five argues, the "Rule does precisely that" by "extending to all 71Five's employees and every aspect of its ministry," including projects that receive no grant funding. At oral argument, the Defendants conceded that the Rule's prohibition on discrimination is not limited to the particular initiatives the Division funds. It applies to grantees as a whole, leaving them no room "to conduct [expressive] activities through programs that are separate and independent from the project that receives [Division] funds."

*Rust*, 500 U.S. at 196. Because 71Five seeks Division funds for only some of its projects, requiring it to certify that it does not discriminate in *any* of its projects is likely an unconstitutional condition. This is because the Division "seek[s] to leverage funding to regulate [expressive association] outside the contours of the [Division-funded] program itself." *Agency for Int'l Dev.*, 570 U.S. at 214–15. The Defendants in theory could justify that extra-programmatic burden on 71Five by showing that it satisfies heightened scrutiny. *See Crowe v. Or. State Bar*, 112 F.4th 1218, 1233 (9th Cir. 2024). But they have not yet tried to do so.

71Five's expressive-association claim is therefore likely to succeed only as much as it challenges the Rule's application to its expressive association in initiatives that receive no Division funding. Because the remaining factors also support granting injunctive relief, 71Five is entitled to a preliminary injunction on that limited basis. *See Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195 (9th Cir. 2024) ("The scope of the [injunction] must be no broader and no narrower than necessary to redress the injury shown by the plaintiff[s]." (alterations in original) (quoting *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018))).

## III.  The district court erred in dismissing 71Five's claims for declaratory and injunctive relief but not its claims for damages.

Finally, we turn from 71Five's motion for a preliminary injunction to the Defendants' motion to dismiss. 71Five challenges the district court's dismissal of all its claims—both for declaratory and injunctive relief and for damages—based on qualified immunity. We have jurisdiction to review

that decision under 28 U.S.C. § 1291 and review it de novo, "accepting as true all well-pleaded allegations of material fact and construing them in the light most favorable to the non-moving party." *Hyde v. City of Willcox*, 23 F.4th 863, 869 (9th Cir. 2022) (citing *Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012)). In contrast to our analysis of 71Five's motion for a preliminary injunction, this inquiry "consider[s] only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Mendoza v. Amalgamated Transit Union Int'l*, 30 F.4th 879, 884 (9th Cir. 2022) (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (per curiam)).

"In § 1983 actions, 'qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sampson v. County of Los Angeles ex rel. L.A. Cnty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1018 (9th Cir. 2020) (internal quotation marks omitted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). But "[q]ualified immunity does not apply to claims for declaratory or injunctive relief." *Shinault v. Hawks*, 782 F.3d 1053, 1060 n.7 (9th Cir. 2015) (citing *Hydrick v. Hunter*, 669 F.3d 937, 939–40 (9th Cir. 2012)). So the dismissal of 71Five's claims for declaratory and injunctive relief was error. Still, we agree with the district court that qualified immunity bars 71Five's damages claims.

"To be entitled to qualified immunity at the motion to dismiss stage, an [official] must show that the allegations in the complaint do not make out a violation of a constitutional right or that any such right was not clearly established at the time of the alleged misconduct." *Hampton v. California*, 83 F.4th 754, 765 (9th Cir. 2023) (citing *Pearson*, 555 U.S. at

232–36). Courts "have discretion to address the questions in reverse order." *Sampson*, 974 F.3d at 1018. The district court did so here, dismissing 71Five's claims under the "clearly established" prong.

The complaint does not make out any clearly established violation of 71Five's free-exercise right. 71Five's claim rests on its argument that the Rule is neither neutral nor generally applicable. Yet 71Five does not allege any facts from which we can reasonably infer a lack of neutrality. The complaint alleges that the Division "retained discretion to create exceptions" from the Rule. As the exhibits to the complaint show, however, the alleged waiver provisions do not apply to the Rule. *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018) (explaining that, in ruling on a motion to dismiss, we "can consider 'exhibits attached to the Complaint'" (quoting *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010))). And while the complaint vaguely alleges that the Rule "has not been applied or enforced consistently," it fails to "identify comparable secular activity that undermines" the Division's interest. *Tingley*, 47 F.4th at 1088.

71Five also fails to establish any clear violation of its right to religious autonomy. Neither the Supreme Court nor we have ever held that the rights protected by the ministerial exception and ecclesiastical abstention may be asserted as standalone claims challenging executive action, rather than as defenses to the invocation of judicial authority. A reasonable official would therefore lack notice that enforcing the Rule against 71Five, without resort to litigation, might violate constitutional protections for religious autonomy.

Finally, whether or not the complaint makes out a violation of 71Five's right of expressive association, that right was not clearly established. 71Five's complaint claims that the Rule violates the First Amendment by attaching nondiscrimination requirements to government grants that are awarded only to select organizations. We are aware of no case, either in this Court or the Supreme Court, clearly establishing that such a requirement impermissibly infringes a grantee's right of expressive association. 71Five relies solely on *Dale*, but that case involved a law forbidding discrimination wholly apart from any government funding scheme. *See* 530 U.S. at 644–45. Our cases finding violations of plaintiffs' expressive association also involve contexts quite different from the grant program at issue here. *See, e.g.*, *Crowe*, 112 F.4th at 1233–40 (compelled membership in state bar); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1163–65 (9th Cir. 2010) (compelled disclosure of ballot-measure campaign's internal communications that chilled plaintiffs' expressive association); *White v. Lee*, 227 F.3d 1214, 1226–29 (9th Cir. 2000) (sweeping government investigation that chilled plaintiffs' expressive association). None of these cases would put the Defendants on notice that requiring recipients of competitive Division grants not to discriminate violates the First Amendment. *See District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018); *Moore v. Garnand*, 83 F.4th 743, 750 (9th Cir. 2023).

71Five's complaint does not allege a violation of any clearly established right under the First Amendment, so the Defendants are entitled to qualified immunity, and the district court did not err in dismissing 71Five's damages claims with prejudice. *See Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 616–17 (9th Cir. 2018) (holding that plaintiff was likely to succeed on the merits of its constitutional

claims and that the doctrine of qualified immunity protected defendants from damages liability).

## IV. Conclusion

We hold that, on this record, the Division's Rule prohibiting religious discrimination by grantees does not itself violate the First Amendment's prohibitions on religious discrimination. Because the district court did not abuse its discretion in finding that the Division applies the Rule neutrally and without exception to prohibit comparable discrimination by all grantees, 71Five is not likely to succeed on its free-exercise claim as presented in its motion. Nor is 71Five's religious-autonomy claim likely to succeed, as we have never held the ministerial exception or ecclesiastical abstention to be standalone claims.

But 71Five has established that—though the Rule permissibly regulates expressive association within Division-funded initiatives—it likely imposes an unconstitutional condition to the extent that it applies beyond those projects to regulate 71Five's independent speech. The remaining preliminary-injunction factors are also satisfied. Therefore, we reverse the district court's denial of 71Five's motion for a preliminary injunction and direct the district court to enter an order enjoining enforcement of the Rule as to initiatives that do not receive grant funding from the Division. Because 71Five does not allege any violation of a clearly established right, we also hold that the Defendants are entitled to qualified immunity and affirm the dismissal of 71Five's claims for damages. And we reverse the district court's dismissal of 71Five's claims for declaratory and injunctive relief, against which qualified immunity does not protect.

**AFFIRMED in part, REVERSED in part, and REMANDED.[1]**

---

Rawlinson, Circuit Judge, concurring in the judgment:

I concur in the judgment because, and only because, of our truncated review of a district court's decision granting or denying injunctive relief, and our obligatory deference to a district court's discretionary decision to decline consideration of arguments and evidence presented in a Reply Brief. *See Harris v. Board of Supervisors*, 366 F.3d 754, 760 (9th Cir. 2004); *see also Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). Otherwise, I would agree with the motions panel, and conclude that the State of Oregon's application of the rules governing its grant program violated Youth 71Five Ministries' right to the free exercise of religion in violation of the First Amendment to the United States Constitution. *See Tingley v. Ferguson*, 47 F.4th 1055, 1088 (9th Cir. 2022) (holding that a law is not one of "generally applicability (neutrality) . . . if the law. . . treat[s] any comparable secular activity more favorably than religious exercise").

I decline to join the majority opinion's analysis because it relies heavily on the premise (mistaken, in my view), that Youth 71Five's website evidenced discrimination, while websites from the secular organizations applying for grants did not evidence discrimination. Keeping in mind that this

---

[1] The emergency injunction, Dkt. No. 18, shall remain in effect until issuance of the mandate. Each party shall bear its own costs on appeal.

analysis is conducted in light of "the government's interest in enacting the law," *see id.*, I cannot agree with this premise.

The State of Oregon's stated purpose for the grant program is to "[p]rovide services to children and youth in a manner that supports educational success, focuses on crime prevention, reduces high risk behaviors and is integrated, measurable and accountable."

Nothing on Youth 71Five's website indicates exclusion of any group from the provision of the services delineated by the State in its grant application solicitation. In contrast, several of the other grant applicants indicated on their websites a focus on some populations to the exclusion of others, including based on gender, race and ethnicity. On these facts, I would conclude that Youth 71Five established a likelihood of success on the merits of its free exercise claim. *See Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (observing that "likelihood of success on the merits . . . is the most important factor in the preliminary injunction" analysis, and that "[i]t is all the more critical when a plaintiff alleges a constitutional violation") (citation and internal quotations omitted).